**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 15-CIV-60535-BLOOM/Valle**

HUMBERTO PELLEGRINO and
PEDRO CLAVERIA,

     Plaintiffs,

v.

GERALD WENGERT, a deputy with the
Broward Sheriff's Office; DAVIS
ACEVEDO, a deputy with the Broward
Sheriff's Office; STEPHEN ROBERTS, a
deputy with the Broward Sheriff's Office;
and SCOTT J. ISRAEL, in his official
capacity as BROWARD COUNTY
SHERIFF,

     Defendants.

_____/

**ORDER ON MOTION TO DISMISS**

**THIS CAUSE** is before the Court on the Motion to Dismiss, ECF No. [10] (the "Motion") filed by Defendant Scott Israel, in his capacity as Sheriff of Broward County, Florida ("BSO"), with respect to Plaintiffs Humberto Pellegrino and Pedro Claveria's ("Plaintiffs") Complaint, ECF No. [1]. The Court has carefully reviewed the Motion, all supporting and opposing submissions, the record in this case and applicable law. For the reasons set forth below, the Motion is **DENIED.**

**I.    BACKGROUND**

This action centers on Plaintiffs' allegations that BSO police officers used excessive force against them in investigating a potential but ultimately nonexistent burglary.

CASE NO. 15-CIV-60535-BLOOM/Valle

Plaintiffs allege that they and two other friends – all four of them "street artists" – arrived at Matco Stone Center, Inc. in Pompano Beach, Florida on the evening of January 17, 2014. Compl. ¶¶ 9-11.  Behind Matco is a loading dock with train tracks, on which there are freight trains and gondolas. *Id.* ¶ 12.  The owner of Matco, an acquaintance of the four men, allows them to enter Matco's premises in order to gain access to the loading dock to paint on the freight trains and gondolas. *Id.*  The men began painting the gondolas. *Id.* ¶¶ 14, 19.

After approximately thirty minutes of painting, they heard a helicopter approaching their location. *Id.* ¶ 22.  Unbeknownst to them, a security guard for Pallet Consultants, Corp., a neighboring business to Matco, had seen the men by the gondolas and called for police assistance, believing that they were burglars. *Id.* ¶¶ 16, 20.  BSO responded to the call. *Id.* ¶ 22. "Nervous and anxious that the helicopter was searching for them," Plaintiffs and their friends hid, crouching on their knees and stomachs under the trains they had been painting. *Id.* ¶ 25. After approximately ten minutes, the men saw police officers approaching their location. *Id.* ¶¶ 26-31.  The officers – including Defendants Gerald Wengert, Davis Acevedo and Stephen Roberts, each deputies with BSO – were armed with assault rifles and accompanied by a police dog. *Id.* ¶¶ 30-33.  The officers surrounded the men, announced their presence, and ordered the men to cease moving and show their hands. *Id.* ¶ 34.  The men fully cooperated without any hesitation by immediately raising their open hands and not otherwise moving. *Id.* ¶ 35.

One or more of the deputies ordered Claveria to come out from under the gondola. *Id.* ¶ 37.  Claveria immediately did as he was instructed, exiting from under the gondola on his hands and knees, sprawling out on his stomach, and surrendering to the deputies. *Id.* ¶¶ 37, 39. He exclaimed, "We are unarmed!  We don't have any weapons!  Here are my hands, sir!" *Id.* ¶ 37.  He posed no threat to the officers. *Id.*  Acevedo, who was holding the police dog by a

2

leash, unleashed the dog on Claveria for no apparent reason and without provocation. *Id.* ¶ 36, 39. All of the other deputies made grunting and other noises to antagonize the police dog into attacking Claveria. *Id.* ¶ 40. The dog bit and tore into Claveria's arm. *Id.* ¶ 41. Claveria screamed in agony, begging Acevedo to release the animal. *Id.* ¶ 42. Instead, Acevedo had the dog continue to chew Claveria's arm. *Id.* ¶ 43. Wengert and Acevedo praised the dog, each repeatedly shouting, "Get him! Grab him! Good boy!" *Id.* The dog continued its attack for approximately two minutes. *Id.* ¶ 44. The officers then caused the dog to release Claveria. *Id.* Roberts, who stood beside Wengert and Acevedo, did not attempt to prevent Acevedo from setting the dog upon Claveria or have the dog called off from its attack. *Id.* ¶ 45. Roberts then dragged Claveria by the neck of his shirt and Wengert handcuffed his arms behind his back, with Claveria shrieking in pain. *Id.* ¶ 46.

Roberts, rifle in hand, then ordered the remaining three men to roll out from under the gondola. *Id.* ¶ 48. They immediately did as they were told. *Id.* ¶ 49. Roberts directed Plaintiff's two friends to follow him, which they did without hesitation. *Id.* ¶¶ 50-51.

Wengert, Acevedo and the police dog then turned to Pellegrino. *Id.* ¶¶ 52-53. Wengert remarked, "He's ready to eat again," and "I think he's still hungry." *Id.* ¶ 54. Wengert then instructed Acevedo to command the dog to attack. *Id.* ¶ 55. As Pellegrino remained surrendered, lying flat on his stomach, Wengert pulled Pellegrino's leg as Acevedo commanded the dog in what sounded (to Pellegrino) like German. *Id.* ¶ 56. Pellegrino felt the dog bite into his pant leg. *Id.* ¶ 59. Acevedo said, "It's just the jeans, he's not even biting him." *Id.* ¶ 60. He then moved the police dog to Pellegrino's left leg, had the dog rip through the jeans below his knee and had the dog bite the exposed skin. *Id.* ¶ 61. Pellegrino screamed in anguish and terror as the dog tore at his left leg. *Id.* ¶ 62. Wengert pointed a gun at Pellegrino, continued to shout

commands in what sounded like German, and screamed, "Eat boy, eat." *Id.* ¶ 63. Wengert and Acevedo oversaw as the dog ripped at Pellegrino's leg for approximately three minutes. *Id.* ¶ 64. Pellegrino cried out, "Please stop! He's tearing my leg! Please!" *Id.* He nearly passed out from the pain. *Id.* ¶ 65. When the dog released its grip, Wengert and Acevedo praised it for a job well done. *Id.* ¶ 66.

Wengert continued to maltreat Pellegrino while leading him to a waiting ambulance and emergency medical technicians. *Id.* ¶¶ 72-75. Claveria's dog bite was so severe that the bone in his arm was exposed. *Id.* ¶ 76. Pellegrino suffered an approximately nine-inch long and three-inch wide open wound, in addition to bite-mark punctures. *Id.* ¶ 77. Plaintiffs were subsequently rushed to the emergency room at Broward County Hospital. *Id.* ¶ 79. Ultimately, the owner of Pallet Consultants declined to press charges because his surveillance video showed that the four men had never accessed his property. *Id*. ¶ 82.

Plaintiffs allege that the officers conduct constitutes excessive force, and that their conduct was implemented or ratified by BSO or effected pursuant to BSO custom or practice. *Id.* ¶ 183. Further, Plaintiffs allege that BSO has "implemented a policy of inadequate investigation that allows an environment for the use of unreasonable force because officers may believe they will not be held accountable for the consequences of using excessive force." *Id.* ¶ 185. In support of their theory of causation and liability, Plaintiffs detail a long series of misconduct by deputy Wengert, followed by effective inaction by BSO. The Complaint recounts at least six separate incidents involving Wengert's alleged inappropriate conduct and use of excessive force between 2006 and 2010:

- In February 2006, Wengert threw to the ground a suspect who had surrendered, directed his K-9 partner on the man as he lay prone and subdued, commanded his dog

4

to engage in a "deadly force" bite, and kicked the man in his face and mouth. *Id.* ¶ 186.a. BSO conducted an internal investigation into this incident, exonerated Wengert from charges of falsifying his report of the incident, and did not discipline him in any way. *Id.* ¶¶ 186.a-b.

- In May 2006, Wengert twice slammed onto a police vehicle a man who had not committed any crime or infraction, and threatened to kill the man while holding him in a headlock. *Id.* ¶ 186.c. BSO took no disciplinary action. *Id.*

- In May 2008, Wengert discharged multiple rounds from his weapon at a vehicle containing several suspects while investigating a potential burglary. *Id.* ¶ 186.d. BSO's standard Shooting Review Board determined that Wengert's actions were justified and chose not to pursue any further investigatory measures. *Id.*

- In March 2010, Wengert taunted a man at a gas station, pulled the man over without any cause a short distance away after the man left the station, yanked the man from his vehicle, and smashed the man's face into the car's door frame. *Id.* ¶ 186.k. BSO conducted no investigation into Wengert's use of excessive force. *Id.*

- In December 2012, Wengert engaged in an improper and retaliatory traffic stop of a teenager who had driven imprudently but inadvertently in close proximity to Wengert's girlfriend. *Id.* ¶ 186.e. The teenager had reversed his car on a relatively major street and nearly hit the girlfriend's car. *Id.* She followed the teen to a restaurant and phoned Wengert. *Id.* Wengert pulled over the teen's car as it left the restaurant. *Id.* In abrogation of BSO protocol, Wengert did not call in a traffic violation or traffic stop, did not look up the vehicles tag, did not request the driver's license or his vehicle registration, did not notify the teen of the reason for the traffic

5

stop, and did not ask the teen to step out of his vehicle. *Id.* Rather, Wengert forced the car door open and pulled the driver from the car. He punched the teen, forced him toward his police vehicle, opened that vehicle's door, and set his police dog on the teen. *Id.* The victim's father lodged a formal complaint with BSO; Wengert was suspended from June 14, 2012 to August 16, 2013; and a grand jury indicted Wengert on criminal charges for his conduct. *Id.* Wengert was acquitted. Despite the higher burden of proof required for criminal conviction, BSO did no investigation of its own, did not levy on Wengert any punishment, and paid Wengert over $63,000 in back-pay after his acquittal. *Id.*

- Later in 2012 – during the pendency of Wengert's criminal case – Wengert threatened to ram his personal vehicle into a police vehicle driven by an officer attempting to serve a subpoena on Wengert's girlfriend. *Id.* ¶ 186.j. The officer had followed Wengert and his girlfriend speeding away from Wengert's home as the officer approached it. *Id.* Wengert turned his vehicle around, spend towards the officer's police vehicle in the wrong lane and into oncoming traffic, and stopped just before causing a collision. *Id.* Wengert exited his vehicle and yelled at the officer, who explained her purpose in serving the subpoena. *Id.*

Plaintiffs allege that BSO's failure to perform any or adequate internal investigation into Wengert's conduct or to discipline or terminate Wengert for his misconduct exhibits their ratification of the use of excessive and unreasonable force by BSO officers and signals to all BSO officers that such conduct is accepted and will not result in reprimand or punishment. *Id.* ¶¶ 193-95. Plaintiffs allege that violations of their constitutional rights and injuries resulted from BSO's policies or customs. *Id*. ¶¶ 196-97.

Plaintiffs Pellegrino and Claveria each assert an identical claim against BSO, under 42 U.S.C. § 1983 (Counts XIII and XIV of the Complaint). The Motion targets only those two claims. Officers Wengert, Acevedo and Roberts are Defendants in this action but have made no submission in connection with the instant Motion.

## II.   LEGAL STANDARD

A pleading in a civil action must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To satisfy the Rule 8 pleading requirements, a complaint must provide the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests. *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 512, (2002). While a complaint "does not need detailed factual allegations," it must provide "more than labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (explaining that the Rule 8(a)(2) pleading standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation"). Nor can a complaint rest on "'naked assertion[s]' devoid of 'further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557 (alteration in original)). The Supreme Court has emphasized that "[t]o survive a motion to dismiss a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* (quoting *Twombly*, 550 U.S. at 570); *see also Am. Dental Assoc. v. Cigna Corp.*, 605 F.3d 1283, 1288-90 (11th Cir. 2010).

When reviewing a motion to dismiss, a court, as a general rule, must accept the plaintiff's allegations as true and evaluate all plausible inferences derived from those facts in favor of the plaintiff. *See Chaparro v. Carnival Corp.*, 693 F.3d 1333, 1337 (11th Cir. 2012); *Miccosukee Tribe of Indians of Fla. v. S. Everglades Restoration Alliance*, 304 F.3d 1076, 1084 (11th Cir.

7

2002); *AXA Equitable Life Ins. Co. v. Infinity Fin. Grp., LLC*, 608 F. Supp. 2d 1349, 1353 (S.D. Fla. 2009) ("On a motion to dismiss, the complaint is construed in the light most favorable to the non-moving party, and all facts alleged by the non-moving party are accepted as true."); *Iqbal*, 556 U.S. at 678. A court considering a Rule 12(b) motion is generally limited to the facts contained in the complaint and attached exhibits, including documents referred to in the complaint that are central to the claim. *See Wilchombe v. TeeVee Toons, Inc.*, 555 F.3d 949, 959 (11th Cir. 2009); *Maxcess, Inc. v. Lucent Technologies, Inc.*, 433 F.3d 1337, 1340 (11th Cir. 2005) ("[A] document outside the four corners of the complaint may still be considered if it is central to the plaintiff's claims and is undisputed in terms of authenticity.") (citing *Horsley v. Feldt*, 304 F.3d 1125, 1135 (11th Cir. 2002)). While the court is required to accept as true all allegations contained in the complaint, courts "are not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *Iqbal*, 556 U.S. at 678. "Dismissal pursuant to Rule 12(b)(6) is not appropriate 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Magluta v. Samples*, 375 F.3d 1269, 1273 (11th Cir. 2004) (quoting *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957)).

### III. DISCUSSION

BSO presents two arguments in favor of dismissing, pursuant to Fed. R. Civ. P. 12(b)(6), Plaintiffs' section 1983 *Monell* claims: (1) that Plaintiffs' alleged constitutional deprivations are attributable to Acevado, not to Wengert, thereby severing any causal connection between BSO's prior acquiescence to Wengert's previous alleged misconduct and the subject incident; and (2) that, in any event, Wengert's previous conduct was not widespread, flagrant, or otherwise

8

sufficient to attach municipal liability under a ratification theory. Reading the allegations in the Complaint in a light most favorable to Plaintiffs, BSO is wrong on both accounts.

### A.   Municipal Liability Under Section 1983 (*Monell* Claim)

Any person acting under color of state law who violates a constitutional right of another is liable for the injured party's losses. 42 U.S.C. § 1983. "Section 1983 provides a fault-based analysis for imposing municipal liability; therefore, plaintiffs must establish that the city was the person who caused them to be subjected to their deprivation." *Depew v. City of St. Marys, Ga.*, 787 F.2d 1496, 1499 (11th Cir. 1986). "[W]hen execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury th[en] the government as an entity is responsible under § 1983." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). "A plaintiff . . . has two methods by which to establish a [municipal actor's] policy:  identify either (1) an officially promulgated [] policy or (2) an unofficial custom or practice of the county shown through the repeated acts of a final policymaker for the [municipal actor]." *Grech v. Clayton Cnty., Ga.*, 335 F.3d 1326, 1329 (11th Cir. 2003). "To establish a policy or custom, it is generally necessary to show a persistent and wide-spread practice[; h]owever, the custom need not receive formal approval." *Depew*, 787 F.2d at 1499; *see also Smith v. Mercer*, 572 F. App'x 676, 679 (11th Cir. 2014) ("A plaintiff must identify a 'consistent and widespread practice' of constitutional deprivations to prove local government liability for an unofficial custom."); *Carter v. Columbus Consol. Gov't*, 559 F. App'x 880, 881 (11th Cir. 2014) ("the challenged practice or custom must be 'so pervasive as to be the functional equivalent of a formal policy'") (quoting *Grech*, 335 F.3d at 1330 n. 6); *Griffin v. City of Opa-Locka*, 261 F.3d 1295, 1308 (11th Cir. 2001) ("[T]o prove § 1983 liability against a municipality based on custom, a plaintiff must

establish a widespread practice. . . .").

"[A] persistent failure to take disciplinary action against officers can give rise to the inference that a municipality has ratified conduct, thereby establishing a 'custom' within the meaning of *Monell*." *Fundiller v. City of Cooper City*, 777 F.2d 1436, 1443 (11th Cir. 1985); *see also Church v. City of Huntsville*, 30 F.3d 1332, 1345 (11th Cir. 1994) ("A municipality's failure to correct the constitutionally offensive actions of its police department may rise to the level of a 'custom or policy' if the municipality tacitly authorizes these actions or displays deliberate indifference toward the police misconduct.") (citation omitted). A plaintiff advancing a ratification theory in support of her *Monell* claim must still establish a "widespread practice" of the relevant constitutional violations. *See*, *e.g.*, *Davis v. City of Leesburg*, 2014 WL 4926143, at *27 (M.D. Fla. Sept. 30, 2014); *Windham v. City of Fairhope, Ala.*, 20 F. Supp. 3d 1323, 1343 (S.D. Ala. 2014), aff'd, 597 F. App'x 1068 (11th Cir. 2015). The prior conduct must also be sufficiently similar. *See Threats v. City of Bessemer*, 2013 WL 2338701, at *5 (N.D. Ala. Apr. 29, 2013) (regarding ratification, "the prior violations must have been sufficiently similar in nature to the violation in the plaintiff's case") (citing *Connick v. Thompson*, 131 S.Ct. 1350, 1360 (2011)); *Gainor v. Douglas Cnty., Georgia*, 59 F. Supp. 2d 1259, 1292 (N.D. Ga. 1998) (past action must be similar to illustrate ratification); *see also Shehada v. Tavss*, 965 F. Supp. 2d 1358, 1374 (S.D. Fla. 2013) ("Prior incidents also must involve facts substantially similar to those at hand in order to be relevant to a deliberate-indifference claim.") (citing *Mercado v. City of Orlando*, 407 F.3d 1152, 1162 (11th Cir. 2005); *Gold v. City of Miami*, 151 F.3d 1346, 1351 (11th Cir. 1998)). Further, "[f]or plaintiffs to state a successful § 1983 claim against a municipality based on a ratification theory . . . they must demonstrate that local government policymakers had an opportunity to review the subordinate's decision and agreed with both the

10

decision and the decision's basis . . . ." *Garvie v. City of Fort Walton Beach*, 366 F.3d 1186, 1189 (11th Cir. 2004) (quoting *Thomas v. Roberts*, 261 F.3d 1160, 1175 n. 12 (11th Cir.2001)). Finally, "[a] § 1983 claim requires proof of an affirmative causal connection between the defendant's acts or omissions and the alleged constitutional deprivation." *Troupe v. Sarasota Cty.*, 419 F.3d 1160, 1165 (11th Cir. 2005); *see also*, *e.g.*, *Lewis v. Wilcox*, 2007 WL 3102189, at *10 (M.D. Ga. Oct. 23, 2007) ("To prevail under [a ratification] theory, a plaintiff must demonstrate that a policy or custom of the governmental entity caused the plaintiff to suffer a constitutional deprivation."); *McElroy v. City of Birmingham, Ala.*, 903 F. Supp. 2d 1228, 1251 (N.D. Ala. 2012) ("Although a municipality may be liable under this 'policy or custom' theory, there must be a causal link between the constitutional violations and the municipality's actual policies or customs.") (citing *Monell,* 436 U.S. at 694).

**B.   Plaintiffs' Allegations Are Sufficient**

The allegations in Plaintiffs' Complaint are sufficient at this stage to support their ratification theory of BSO's section 1983 liability.

BSO does not challenge Plaintiffs' characterization of its officers' use of force as excessive under the circumstances. Rather, they argue that Plaintiffs have failed to connect the officers' actions on the date of the subject incident with any custom of policy implemented or endorsed by BSO.

BSO's reading of the Complaint to distance deputy Wengert from Plaintiffs' injuries is unconvincing. Plaintiffs allege, several times over, that Wengert was partially but directly responsible for the police dog's attacks on both Plaintiffs and for their injuries. They allege that Wengert, along with the other officers, used verbal commands (such as grunting and other noises) to direct the dog to attack Claveria, and that Wengert repeatedly encouraged and praised

the dog for biting and tearing into Claveria's arm. Compl. ¶¶ 40, 44. Wengert's actions are even more pronounced regarding the dog's attack on Pellegrino. Wengert set the stage for the attack with his remarks that the dog was "ready to eat again," and "I think he's still hungry." Id. ¶ 54. Wengert then instructed Acevedo to command the dog to attack. Id. ¶ 55. As Pellegrino remained surrendered, lying flat on his stomach, Wengert pulled Pellegrino's leg as Acevedo commanded the dog to attack Pellegrino. Id. ¶ 56. Wengert pointed a gun at Pellegrino, shouted commands to the dog in what sounded like German, and screamed, "Eat boy, eat." Id. ¶ 63. Wengert oversaw as the dog ripped at Pellegrino's leg for approximately three minutes. Id. ¶ 64. Wengert then praised the dog for a job well done. Id. ¶ 66. To the extent BSO understands Plaintiffs' ratification theory to rise and fall on Wengert's actions, Plaintiffs clearly allege that Wengert himself engaged in the use of excessive force against them.

Plaintiffs allegations are consistent with a theory of liability connecting the actions of all of the officers at the scene with BSO's ratification of the use of excessive force. Plaintiffs' narrative – that BSO observed Wengert engage in a series of egregious and escalating misbehavior over the course of several years without taking sufficient action to investigate or rectify the problem, resulting in Wengert's perceived impunity to have his police animal brutally assault Plaintiffs – is particularly robust with respect to Wengert himself. And, BSO's protestations notwithstanding, there are certainly a sufficient number of adequately detailed incidents involving Wengert in the Complaint to constitute widespread (as opposed to incidental) and egregious conduct sufficiently similar to the subject incident (i.e., the unprovoked use of excessive force on suspects, including with a canine officer). But, going further, their allegations plausibly state that the other BSO officers, Acevedo included, acted in accordance with what they understood to be BSO's policy on appropriate conduct – an understanding they gained

through BSO's ratification of Wengert's conduct over the years. After all, a municipality's effective pronouncement of its policies in ratifying misconduct need not be targeted to one particular employee. *See*, *e.g.*, *Rivas v. Figueroa*, 2012 WL 1378161, at *2 (S.D. Fla. Apr. 20, 2012) (identifying sixteen alleged previous instances of misconduct by several police officers, none of whom were involved in the subject incident). As the court explained in *Rivas*,

> [T]he Plaintiffs are claiming that the numerous examples of [] police officers using excessive force without any official repercussion for their actions demonstrates the existence of a widespread practice of tacitly approving of this unconstitutional activity. In other words, although there is no formal policy allowing [] police officers to use excessive force, [the municipality's] decision to not discipline the offending officers, in the face of numerous instances of excessive force, has established a custom that this activity is permitted. . . .
>
> While the multiple examples of prior incidences alleged by the Plaintiffs are not precisely identical to the facts in this case, they are similar enough to make out a claim that [the municipality] has adopted a widespread practice of permitting its officers to use excessive force. The [c]omplaint adequately pleads a cause of action that use of excessive force by [the municipality] officers (without any negative repercussions) has become so permanent and well settled as to constitute a custom or policy.

*Id.* at *3.

It also bears noting that "[a]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for her nonfeasance." *Salvato v. Miley*, --- F.3d ---, 2015 WL 3895455, at *6 (11th Cir. June 25, 2015) (quoting *Fundiller*, 777 F.2d at 1442). By extension, Acevedo's "inaction" at the scene of the subject incident (if that is how BSO wishes to characterize Acevedo's participation) is attributable to BSO's alleged ratification of Wengert's past use of excessive force.

BSO may have perfectly good reasons for declining to investigate Wengert's conduct, for declining to punish Wengert for his conduct, and for maintaining Wengert's employment as a BSO deputy. It may turn out that both Wengert and BSO were justified at each turn and that

CASE NO. 15-CIV-60535-BLOOM/Valle

BSO in fact has no policy of permitting the excessive use of force because there was no such excessive use of force to condone or ratify. A fact finder will consider the facts brought to light by discovery and those reasons at the appropriate point in this litigation. For now, accepting Plaintiffs' allegations as true, Plaintiffs have sufficiently stated claims against BSO under section 1983 for causing violations of their constitutional rights and their injuries.

## IV.  CONCLUSION

For the foregoing reasons, it is hereby **ORDERED AND ADJUDGED** that the Motion, ECF No. [10], is **DENIED**. BSO shall respond to Plaintiffs' Complaint on or before **July 16, 2015**.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Florida, this 2nd day of July, 2015.

_____
**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:  counsel of record