**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 15-cv-60535-BLOOM/Valle**

HUMBERTO PELLEGRINO and
PEDRO CLAVERIA,

       Plaintiffs,

v.

GERALD WENGERT, et al.,

       Defendants.

_____/

## ORDER ON MOTION TO STRIKE

**THIS CAUSE** is before the Court upon Defendants' Motion to Strike Plaintiffs' Police Expert George Kirkham, ECF No. [118], and Plaintiffs' Motion to Strike/Limit Certain Opinions of Defense Expert Charles Mesloh, ECF No. [120]. The Court has carefully reviewed the Motions, all supporting and opposing submissions, the record in this case, and applicable law. For the reasons set forth below, the Motions are granted in part and denied in part.

### I. BACKGROUND

This action, filed by Plaintiffs Humberto Pellegrino ("Pellegrino") and Pedro Claveria ("Claveria") (collectively, "Plaintiffs") against Gerald Wengert ("Wengert"), Davis Acevedo ("Acevedo"), Leonard Smith ("Smith"), and Scott J. Israel, in his official capacity as Broward County Sheriff ("BSO") (collectively, "Defendants"), centers on allegations by Plaintiffs that BSO deputies used excessive force against them in investigating a potential burglary by allegedly releasing and instructing a police dog

("K-9") to attack Plaintiffs. Familiarity with the procedural and factual background is assumed. *See Pellegrino v. Wengert*, No. 15-CIV-60535, 2015 WL 4065376, at *1 (S.D. Fla. July 2, 2015).

## II. LEGAL STANDARD

Federal Rule of Evidence 702 governs the admissibility of expert testimony. When a party proffers the testimony of an expert under Rule 702 of the Federal Rules of Evidence, the party offering the expert testimony bears the burden of laying the proper foundation, and that party must demonstrate admissibility by a preponderance of the evidence. *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1291-92 (11th Cir. 2005); *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1306 (11th Cir. 1999). In making the determination of whether expert testimony and any report prepared by the expert may be admitted, the Court engages in a three-part inquiry of whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue. *City of Tuscaloosa v. Harcros Chems., Inc.*, 158 F.3d 548, 562 (11th Cir. 1998) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589, 113 S. Ct. 2786, 2794, 125 L. Ed. 2d 469 (1993)). The Eleventh Circuit refers to each of these requirements as the "qualifications," "reliability," and "helpfulness" prongs. *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004). While some overlap exists among these requirements, the court must individually analyze each concept. *Id.*

An expert in this Circuit may be qualified "by knowledge, skill, experience, training, or education." *J.G. v. Carnival Corp.*, -- F. Supp. 2d --, 2013 WL 752697, at *3 (S.D. Fla. Feb. 27, 2013) (citing *Furmanite Am., Inc. v. T.D. Williamson*, 506 F. Supp. 2d 1126, 1129 (M.D. Fla. 2007) (citing Fed. R. Evid. 702)). "An expert is not necessarily unqualified simply because [his] experience does not precisely match the matter at hand." *Id*. (citing *Maiz v. Virani*, 253 F.3d 641, 665 (11th Cir. 2001)). "[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise go to credibility and weight, not admissibility." *See Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, Case No. 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)). "After the district court undertakes a review of all of the relevant issues and of an expert's qualifications, the determination regarding qualification to testify rests within the district court's discretion*." J.G.*, 2013 WL 752697, at *3 (citing *Berdeaux v. Gamble Alden Life Ins. Co.*, 528 F.2d 987, 990 (5th Cir. 1976)).[1]

When determining whether an expert's testimony is reliable, "the trial judge must assess whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology properly can be applied to the facts in issue." *Frazier*, 387 F.3d at 1261-62 (internal formatting, quotation, and citation omitted). To make this determination, the district court examines: "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific

---

[1] Decisions of the former Fifth Circuit rendered prior to September 30, 1981, are binding decisions in the Eleventh Circuit pursuant to *Bonner v. City of Pritchard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc).

community." *Id.* (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois, UK Ltd.*, 326 F.3d 1333, 1341 (11th Cir. 2003)). "The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony." *Id.* at 1262 (citing *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 152 (1999)). Thus, the aforementioned factors are non-exhaustive, and the Eleventh Circuit has emphasized that alternative questions may be more probative in the context of determining reliability. *Id.* (citations omitted). Consequently, trial judges are afforded "considerable leeway" in ascertaining whether a particular expert's testimony is reliable. *Id.* at 1262 (citing *Kumho*, 526 U.S. at 152)).

Additionally, where an expert proffers non-scientific, experience-based testimony, sometimes other factors may prove more useful in addition to the four factors, and a Court has flexibility in assessing reliability. *Frazier*, 387 F.3d at 1262. This assessment "will depend . . . on the nature of the issue, the expert's particular expertise, and the subject of his testimony."  *United States v. Brown*, 415 F.3d 1257, 1268 (11th Cir. 2005) (quoting *Kumho Tire Co., Ltd.*, 526 U.S. at 150) (internal quotations omitted)). The Court must ensure the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts.  *Id.* at 1261. "An expert's unexplained assurance that [his] opinions rest on accepted principles" is not enough. *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1130 (M.D. Fla. 2007) (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)).

The final element, helpfulness, turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person."

*Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014) (quoting *Frazier*, 387 F.3d at 1262) (formatting omitted). "[A] trial court may exclude expert testimony that is 'imprecise and unspecific,' or whose factual basis is not adequately explained." *Id.* (quoting *Cook ex rel. Estate of Tessier v. Sheriff of Monroe Cty., Fla.*, 402 F.3d 1092, 1111 (11th Cir. 2005)). To be appropriate, a "fit" must exist between the offered opinion and the facts of the case. *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004) (citing *Daubert*, 509 U.S. at 591). "For example, there is no fit where a large analytical leap must be made between the facts and the opinion." *Id.* (citing *General Electric Co. v. Joiner*, 522 U.S. 136 (1997)).

Under *Daubert*, a district court must take on the role of gatekeeper, but this role "is not intended to supplant the adversary system or the role of the jury." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted). Under this function, the district court must "ensure that speculative, unreliable expert testimony does not reach the jury." *McCorvey v. Baxter Healthcare Corp.*, 298 F.3d 1253, 1256 (11th Cir. 2002). "[I]t is not the role of the district court to make ultimate conclusions as to the persuasiveness of the proffered evidence." *Quiet Tech.*, 326 F.3d at 1341 (internal quotations and citations omitted). Thus, the district court cannot exclude an expert based on a belief that the expert lacks personal credibility. *Rink*, 400 F.3d at 1293, n. 7. To the contrary, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Quiet Tech.*, 326 F.3d at 1341 (quoting *Daubert*, 509 U.S. at 596). "Thus, '[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates

the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)). Ultimately, as noted, "a district court enjoys 'considerable leeway' in making" evidentiary determinations such as these. *Cook*, 402 F.3d at 1103 (quoting *Frazier*, 387 F.3d at 1258).

## III. DISCUSSION

### A. Dr. Kirkham

Defendants move to exclude the opinions and testimony of Dr. George Kirkham, Plaintiff's use of force expert, as an expert in this case based upon all three requirements of *Daubert* and Rule 702. Defendants argue that (1) Dr. Kirkham is not qualified competently regarding the matters he intends to address; (2) the methodology by which Dr. Kirkham reaches his conclusions is not sufficiently reliable; and (3) the testimony of Dr. Kirkham will not assist the trier of fact. Defendants further seek to strike Dr. Kirkham as an expert in this matter under Rule 403 because his testimony will cause unfair prejudice, confuse the issues, and mislead the jury.

Dr. Kirkham set forth his complete opinions in a February 12, 2016 Report, ECF No. [118-1] ("Kirkham Report"). Defendants highlight the following opinions from his report:

> [T]he medical records and photographs of bite injuries sustained by the plaintiffs provide mute corroboration of the undeniable brutality that was inflicted on them by Gerald Wengert and Davis Acevedo . . . . It is my considered professional opinion as a former law enforcement officer and a criminologist who has specialized in police standards and procedures for over forty years that no competent law enforcement administrator could possibly conclude that the type and horrific degree of force used against [Humberto] Pellegrino and Pedro Claveria was reasonable and necessary.

Kirkham Report 9.

Case No. 15-cv-60535-BLOOM/Valle

Defendants also emphasize certain portions of Dr. Kirkham's deposition testimony, in which he offered specific opinions as to Defendant Acevedo's actions:

> Q. Do you hold any opinions directly related to Deputy Acevedo in this matter?
>
> A. Yes.
>
> Q. And those are what?
>
> A. Those specifically are that he – it's my considered professional opinion that he used his K-9, Dino, as a form of excessive, and I would add outrageously excessive, and unreasonable force on the night in question.
>
> Q. Tell me, how is it that you concluded that he used his K-9 as an excessive unreasonable force?
>
> A. Okay. On the following basis: First, looking at – You understanding I'm not a medical doctor, though I've dealt with an awful lot of force situations over the years. Considering the magnitude of the injuries suffered by the plaintiffs in the case at hand and juxtaposing that with various things in the file, including the testimony of officer or Deputy Acevedo in the criminal case, in terms of him saying – it sounds like a pretty simple perfunctory thing – that no one offered any resistance to the officers when they came out from the under the cars. We were left with a conundrum of explaining how he was the only dog – He was the dog handler on the scene, albeit the junior dog handler, if we can say. It was his dog. But using that dog, how is it possible, I know it's a rhetorical question and experts don't get to ask questions, but how could any officer use a form of force like that and produce this magnitude of injuries, given his own version of what was happening, what these people did? I mean, we can be talking here about something other than a K-9. We could be talking about an asp or we could be talking about multiple applications of a Taser probe or we can be talking about emptying a can of OC on someone, but we are talking about a dog, which curiously the Broward Sheriff's Department regards as a weaponless device which is astonishing.

Kirkham Dep., ECF No. [118-2], 49-51.

Defendants argue that Dr. Kirkham has no experience in using a police K-9, training a police K-9, or examining K-9 bites and, therefore, is not qualified to render an opinion as an expert in this matter. Although Defendants move to strike Dr. Kirkham's

proffered opinion in its entirety, the Motion does not specifically address Dr. Kirkham's statements regarding BSO policy and practices regarding use of force and discipline.[2]

### i.   Qualifications

Defendants argue that Dr. Kirkham has no education or experience in handling or training K-9s or in the actual use of K-9s in the field. Specifically, Defendants maintain that Dr. Kirkham concedes that he is not a K-9 expert, *see* Kirkham Dep. 72:6-9 ("I've never been trained as a K-9 – I'm not here as a K-9 expert."); has never examined wounds to determine how much force was used by the K-9 or how many bites or how prolonged was the bite and hold; and has little to no experience with K-9 cases and could not recall prior K-9 cases in which he has been involved.

Plaintiffs contemplate that there are three possible factual scenarios in this case: (1) Plaintiffs were completely under the train car when apprehended by the K-9; (2) Plaintiffs were partially out from under the train car, with hands visible, when apprehended by the K-9; and (3) Plaintiffs were completely out from under the train car when apprehended by the K-9. In light of these three scenarios, Plaintiffs concede that certain of Dr. Kirkham's opinions fail to satisfy *Daubert* and Rule 702—namely, Dr. Kirkham should not be permitted to offer opinions that the nature and extent of the injuries sustained by Plaintiffs prove that Defendants used excessive K-9 force in the scenario that Plaintiffs were under the train car at the time the K-9 apprehended them. Plaintiffs agree that Dr. Kirkham lacks the requisite qualifications to serve as an expert on dog bite wounds. In his deposition testimony, Dr. Kirkham asserted that any opinions

---

[2] Indeed, Defendants concede that they "do not contest that [Dr.] Kirkham may be qualified to generally opine as to police practice and whether policies meet the appropriate standards." Reply, ECF No. [133], 3.

he rendered regarding the extent of Plaintiffs' injuries—opinions that Plaintiffs now agree Dr. Kirkham lacks the requisite qualifications to render—are only related to Defendants' purported scenario that Plaintiffs were completely under the train car. *See* Kirkham Dep. 223 ("Q. All the discussion today with respect to the extent of the injuries is related to your opinion giving the benefit of the doubt to the defendants in the defendants' version that the plaintiffs were completely under the train car; is that correct? A. That's correct.").

Plaintiffs, however, maintain that Dr. Kirkham is sufficiently qualified to testify that Defendants used excessive force in the other two possible scenarios—that Plaintiffs were either completely out from under the train car when bitten by the K-9 or partially out from under the train car (i.e., just the upper torso with hands visible) when apprehended by the K-9. Dr. Kirkham also rendered opinions as to those two scenarios:

> Q. . . . You had talked that your opinions are based on a few scenarios. And in one of those scenarios, correct me if I'm wrong, if the plaintiffs' version of events are correct, and as they testified to and as the witnesses testified to, they had all been out from underneath the train and they had surrendered, if that version of events, which I understand defense disagrees with, but if that version is correct, they should not have been bitten at all, correct? . . .
>
> A. That is correct. No reason to use the dog at all in bite mode.
>
> Q. And then based on, if I understand, based on the testimony, I know we only have the criminal testimony in that case of Acevedo, Acevedo testified that Mr. Claveria was at least halfway outside of the train car; is that correct?
>
> A. He did.
>
> Q. And in that scenario with Mr. Claveria at least halfway outside of the train car, is there any basis to use the K-9 on Mr. Claveria?
>
> A. No. You've got partial compliance and that's a long step towards getting total compliance.

Kirkham Dep. 222-23.

Plaintiffs emphasize that Dr. Kirkham's years of experience as a law enforcement officer, criminal justice professor, and police training consultant and lecturer qualify him to render these opinions regarding whether the K-9 apprehension was appropriate if Plaintiffs were either completely or halfway out from under the train car. Specifically, Dr. Kirkham has 19 years of experience as a law enforcement officers and more than 40 years of criminal justice teaching, consulting, training, and application and "has more than sufficient experience with K-9 use in law enforcement to pass legal muster." Resp., ECF No. [129], 7; *see also Summers v. Cty. of Charleston*, No. 2:10-CV-3291-RMG, 2012 WL 3867108, at *3 (D.S.C. June 13, 2012) (describing Dr. Kirkham's educational and professional experience and determining that he is qualified to offer expert testimony regarding the alleged use of excessive force involving a Taser, despite his "limited practical experience in situations such as the one faced by defendant officers on the night in question").

Indeed, Dr. Kirkham's curriculum vitae reveals that he holds a B.A. and M.S. in criminology from California State University at San Jose as well as a doctoral degree in Criminology from University of California at Berkeley and is currently Professor Emeritus at the College of Criminology and Criminal Justice at Florida State University. *See* Kirkham Report 11-19. Dr. Kirkham states that he has served as a private consultant and expert witness for both plaintiff and defense in over 1,500 civil litigation cases arising from police actions, private security operations, and jail confinement conditions. *Id.* Dr. Kirkham has served as an instructor, lecturer, or consultant at numerous law enforcement agencies and organizations and has published books, educational films,

articles and professional papers regarding law enforcement. *Id.* In light of his experience, the Court finds that Dr. Kirkham is at least minimally qualified, and, therefore, Defendants' "objections to the level of [Dr. Kirkham's] expertise go to the credibility and weight, not admissibility." *Clena Investments, Inc. v. XL Specialty Ins. Co.*, 280 F.R.D. 653, 661 (S.D. Fla. 2012) (citing *Kilpatrick v. Breg, Inc.*, Case No. 08-10052-CIV, 2009 WL 2058384 (S.D. Fla. June 25, 2009)); *see also Summers*, 2012 WL 3867108, at *3 ("The Court finds that each of Defendants' criticisms of Dr. Kirkham go to the weight of his testimony and not its admissibility and that such criticisms, rather than serving as a basis for excluding Dr. Kirkham's testimony, may serve as a basis for cross-examination.").

## ii.  Reliability

A significant portion of Defendants' argument that the methodology by which Dr. Kirkham reaches his conclusions is not sufficiently reliable focuses on Dr. Kirkham's opinions regarding Plaintiffs' injuries. Plaintiffs concede that Dr. Kirkham's opinions related to the *nature and extent* of Plaintiffs' injuries must be excluded under *Daubert* and Rule 702. Defendants emphasize that Dr. Kirkham lacks specific experience with K-9 apprehensions and is unable to explain the standards upon which he relies for his opinions, including his statement that a K-9 bite is classified under law enforcement standards as an "intermediate level of force." *See* Kirkham Dep. 173-74.

When an expert's proffered opinion is based upon his or her experience, the Court must ensure the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient basis for the opinion, and how that experience is reliably applied to the facts. *United States v. Brown*, 415 F.3d

11

1257, 1261 (11th Cir. 2005). "An expert's unexplained assurance that [his] opinions rest on accepted principles" is not enough. *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1130 (M.D. Fla. 2007) (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)).

This, however, is not a circumstance in which an expert provides mere assurances that his opinions rest on accepted principles. Dr. Kirkham bases his opinions on several purportedly well-established standards and methodologies, including the Use of Force Continuum (or Matrix),[3] the *Graham v. Connor* standard,[4] and publications by the International Associations of Chiefs of Police (IACP),[5] to conclude that Plaintiffs did not exhibit a level of resistance warranting the use of the K-9.

Defendants do not contest the reliability or validity of these sources and standards or whether they can be applied in the instant matter. Indeed, it appears that Defendants' own expert, Dr. Charles Mesloh, relied upon or confirmed the validity of these same sources in his report and deposition testimony. *See* Mesloh Report, ECF No. [120-1]; Mesloh Dep., ECF No. [120-2]. Plaintiffs assert that a 2007 article co-authored and relied upon by Dr. Mesloh details the same Use of Force Continuum upon which Dr. Kirkham relies. *See* Mesloh Report 5 ("The use of force by the suspect is a significant predictor of force by officers (Mesloh, Henych & Wolf, 2007)."); *id.* at 2 (citing information utilized to create report, including the 2007 article, "Mesloh, C. Henych, M. & Wolf, R. (2007). Less Lethal Weapon Effectiveness, Use of Force, and Suspect & Officer Injuries: A Five-Year Analysis. Report to the National Institute of Justice."); *see also* Resp. 11-12 (stating

---

[3] *See* Kirkham Dep. 174.
[4] *Graham v. Connor*, 490 U.S. 386, 109 S. Ct. 1865, 104 L. Ed. 2d 443 (U.S. 1989). *See* Kirkham Report 8; Kirkham Dep. 97, 103, 130, 189, 201, and 226.
[5] *See* Kirkham Report 7-8; Kirkham Dep. 65-66, 81-83, 131-32, 173-76.

that the Mesloh, Henych & Wolf 2007 article details the same Use of Force Continuum and providing a graphic of the Force Continuum as used in the article). Moreover, during his deposition testimony, Dr. Mesloh states that he would typically rely upon the *Graham v. Connor* standard as well as the spectrum of force to determine "where the appropriateness [of force] lies or [does not] lie." *See* Mesloh Dep. 91-93; *see also* Mesloh Report 2, 6, 13. Dr. Mesloh also cites to and recognizes IACP publications as an authoritative source. *See* Mesloh Report 2-3 (citing "International Association of Chiefs of Police. (2001). Law enforcement canines concepts and issues paper. Washington: IACP National Law Enforcement Policy Center."); Mesloh Dep. at 100 (stating that IACP is "recognized" and "an authority on legal issues relating to law enforcement" and are "very good at identifying legal issues").

Given Dr. Kirkham's qualifications and experience as a use of force expert, the Court finds that Dr. Kirkham's application of generally accepted use of force and law enforcement standards to the instant matter are sufficiently reliable under *Daubert* and Rule 702 standards.

### iii.   Helpfulness

Defendants argue that if Dr. Kirkham merely testifies that any use of a K-9 on a suspect who is "fully exposed and visible, hands visible with no weapons [and] lying flat on the ground" would constitute excessive force, then his testimony will not assist the trier of fact and does not require expert testimony at all as this is the same type of argument that can be made by Plaintiffs' counsel. Defendants further argue that, as Plaintiffs themselves emphasized, Defendants' expert, Dr. Mesloh, has agreed that if the suspect was fully exposed and visible, using a K-9 to apprehend that individual would be

unnecessary. *See* Resp. 5 (citing Mesloh Dep. 6-8 ("Q. Do you agree with me that while I know you dispute the facts for a moment here as alleged by the Plaintiffs, but do you agree with me – are we at least on the same page – that if the Plaintiffs' version of the events are true, that they were completely out from underneath the train car, that there [should not] have been any use of the K9 force whatsoever? A. That's correct. Q. And it would have been excessive force to do so? A. Yes, it would have. If – if it was exactly the way they said it, there was no resistance. Absolutely. . . . Q. . . . That it is from the waist up you see – from the waist up is outside of the car, which would include arms and hands, and you can see hands – the officer can clearly see hands, you would agree with me, in that scenario, K9 force should not have been used then, correct? A. Correct.")). Such testimony regarding that scenario, therefore, would be unnecessary and will not assist the trier of fact.

The element of helpfulness turns on whether the proffered testimony "concern[s] matters that are beyond the understanding of the average lay person." *Edwards v. Shanley*, 580 F. App'x 816, 823 (11th Cir. 2014). As discussed *supra*, Dr. Kirkham's opinions are based upon standards and resources, such as the Use of Force continuum, that are not readily available to an average lay person. Dr. Mesloh testified that his job as an expert is to look at the continuum and determine whether the situation justifies the force used, emphasizing that this is not "an equation that [is] simple [and] easy to balance," but that as an expert he has a "pretty good feel for . . . determining . . . where the appropriate lies or [does not] lie." Mesloh Dep. 92. The Court finds no reason why a level of expertise would not similarly be required for Dr. Kirkham to render his own interpretation under the continuum. Dr. Kirkham's proffered testimony, therefore,

concerns matters that are beyond the understanding of an average lay person. Further, the fact that Defendants' and Plaintiffs' experts may present overlapping or duplicative information should not alone foreclose Plaintiffs' opportunity to present their own expert's opinions.

Nor does the Court conclude that Dr. Kirkham's testimony regarding general use of force issues or the use of a Taser, asp, or other device, must be stricken as misleading or causing prejudice or confusion under Rule 403. "The Supreme Court recognized in *Daubert* the intricate role of Rule 403 in an expert testimony admissibility analysis when it noted that expert testimony could be 'both powerful and quite misleading because of the difficulty in evaluating it.'" *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1310 (11th Cir. 1999) (quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 595 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).

Dr. Kirkham's testimony and report compare the threat or use of a police K-9 relative to other types of force along the force continuum, such as a Taser or asp. *See* Kirkham Report 7; Kirkham Dep. 50-51, 65-66, 71-72, 102-03. Defendants have provided no specific reason why this comparison would cause prejudice or confusion. Accordingly, the Court declines to strike Dr. Kirkham's testimony on this basis. Indeed, "'[o]n cross-examination, the opposing counsel [will be] given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

For the reasons stated above, Dr. Kirkham is not qualified as an expert to render opinions with regard to the nature and extent of Plaintiffs' injuries and, consequently, whether use of force was excessive in the scenario that Plaintiffs were completely under the train car at the time of the K-9 apprehension. Plaintiffs, therefore, may not utilize Dr. Kirkham's opinions or testimony in that regard.

### B.  Dr. Mesloh

Plaintiffs argue that certain opinions proffered by Mesloh (1) are based upon inadmissible hearsay; (2) invade the province of the jury; and (3) fail to satisfy *Daubert* and, therefore, should be limited and/or stricken.

### i.   Whether Dr. Mesloh's Opinions Rely on Hearsay

Plaintiffs argue that Dr. Mesloh's report and opinions are based upon inadmissible hearsay evidence—specifically, Defendant Acevedo's Use of Force Report and Acevedo's deposition testimony from Plaintiffs' criminal case.[6] Although Plaintiffs recognize that an expert may rely on inadmissible hearsay to explain the basis of his report or opinion, they emphasize that this evidence may not be admitted for the truth of the matter asserted. Defendants, Plaintiffs aver, have used Dr. Mesloh's opinion and expert testimony as a proverbial backdoor through which to introduce Defendant Acevedo's statements, without opportunity for meaningful cross-examination. Specifically, Plaintiffs argue that there is no record evidence aside from Acevedo's

---

[6] *See, e.g.*, Mesloh Dep. 12:17-13:7 ("Q. . . . [A]nytime we talk about Acevedo's deposition, we'll only be talking about Acevedo's criminal deposition in the criminal case, correct? A. Correct. A. The next line, 'Plaintiff Pellegrino remained in hiding and did not respond to another K9 warning.' Where does that information come from? A. That would have come from Deputy Acevedo's – either his . . . offense report or his deposition. Q. And it further says, 'K9 Dino was deployed a second time under the train car.' Is that again from Deputy Acevedo's criminal deposition or offense reports? A. Yes. Q. 'K9 Dino then engaged Pellegrino.' Same thing? A. Yes."); *see also* Mesloh Report (citing to Acevedo's account of the incident throughout the report).

statements upon which Dr. Mesloh relies that would support the contention that Plaintiffs were entirely under the train when they were apprehended by the K-9. *See United States v. Scrima*, 819 F.2d 996, 1002 (11th Cir. 1987) ("Rule 703 . . . is not an open door to all inadmissible evidence disguised as expert opinion.").

Defendants counter that the Use of Force Report, while hearsay, is admissible under an exception to the hearsay rules as both a record of regularly conducted business activity and a public record. Even so, Defendants argue, Dr. Mesloh has not relied solely on Acevedo's testimony or report and has applied his expertise to form his opinions based upon his education, training, and experience.

Rule 703 provides that "[i]f experts in the particular field would reasonably rely on those kinds of facts or data in forming an opinion on the subject, they need not be admissible for the opinion to be admitted." Fed. R. Evid. 703; *see also United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing Rule 703) ("[N]o other kind of witness is free to opine about a complicated matter without any firsthand knowledge of the facts in the case, and based upon otherwise inadmissible hearsay if the facts or data are 'of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject.'"); *United States v. Great Lakes Dredge & Dock Co.*, No. 97-10075-CIV, 1999 WL 1293469 (S.D. Fla. July 28, 1999) ("Rule 703 merely permits expert reports containing hearsay, or other inadmissible evidence, upon which an expert properly relies, to be admitted to explain the basis of the expert's opinion . . . [but] [t]o the extent the reports contain inadmissible hearsay, such inadmissible hearsay will not be admitted for the truth of the matter asserted.") (internal alteration and citation omitted); *Briscoe v. White*, No. 2:03-CV-154-FTM29SPC, 2004 WL 5488228, at *3 (M.D. Fla.

May 24, 2004) (citing *Great Lakes Dredge*, 1999 WL 1293469) ("Rule 703 allows expert reports to contain hearsay or other inadmissible evidence, which the expert properly relies on to be admitted to explain the basis of the expert's report.")).[7]

In *United States v. Garcia*, 447 F.3d 1327, 1336-37 (11th Cir. 2006), the Eleventh Circuit drew a distinction between the permissible proffered expert opinions in that case and those excluded in *United States v. Dukagjini*, 326 F.3d 45, 58 (2d Cir. 2003). In *Dukagjini*, the Court determined that, although an expert was permitted to "rely on hearsay evidence for the purposes of rendering an opinion based on his experience," the expert in that case was merely "repeating hearsay evidence without applying any expertise whatsoever." 326 F.3d at 58. In contrast, the *Garcia* Court held that the district court had not abused its discretion in determining that a debriefing of suspected drug traffickers was the "type of evidence" that is "reasonably relied upon" by seasoned drug enforcement officers and that the expert "had applied his expertise in relying on, among other sources," an interview with a suspected drug trafficker. *See also Indus. Eng'g & Dev., Inc. v. Static Control Components, Inc.*, No. 8:12-CV-691-T-24-MAP, 2014 WL 4986482, at *3 (M.D. Fla. Oct. 6, 2014) (striking portions of an expert report that rely upon specific sale dates without applying any expertise to or drawing any conclusions based upon those dates, but permitting portions of the report regarding details about products, which the expert used to form his opinions regarding their functionality, and

---

[7] "The Eleventh Circuit has alluded to [a] distinction to which some courts adhere, that Rule 702 governs only the scientist's 'major premise' (the 'principle, procedure, or explanatory theory derived by the inductive, scientific technique'), while Rule 703 addresses 'the sources the expert may consult in collecting the case-specific information to serve as the minor premise.'" *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312-13 (11th Cir. 1999) (quoting *Davis v. Southern Bell Tel. & Tel. Co.,* (S.D. Fla. Feb. 1, 1994) (citing Edward J. Imwinkelreid, *The "Bases" of Expert Testimony: The Syllogistic Structure of Scientific Testimony,* 67 N.C.L.Rev. 1 (1988))). Both Rules are implicated in Plaintiffs' Motion.

deferring until trial the issue of whether the expert may disclose any inadmissible facts or data on which the expert relied).

Here, it is not unreasonable to conclude that a use of force expert would typically rely upon, among other things, a Use of Force Report as well as officer testimony to render an opinion as to whether that officer used excessive force. Plaintiffs do not challenge Dr. Mesloh's qualifications as an expert in this case. Dr. Mesloh's Report applies his experience as a use of force expert and K-9 handler to determine that, in his opinion, the circumstances surrounding the incidences—including the location of the bites, the apparent "re-engaging bites" to Plaintiff Pellegrino, and the extent of the bite injuries—are more consistent with Defendant Acevedo's account as to Plaintiffs' location at the time of apprehension, the extent of resistance, and the duration of the bites. Dr. Mesloh's opinions, therefore, permissibly rely upon the Use of Force Report and Acevedo's deposition testimony.[8] To the extent that Plaintiffs seek to preclude Dr. Mesloh from disclosing any inadmissible evidence upon which his expert opinion relies, that request is better addressed on a motion *in limine*, which Plaintiffs have advised the Court is forthcoming. *See* Mot. at 4, n. 2 ("Defendants' decision to exercise their Fifth Amendment rights against self-incrimination will be the subject of a forthcoming Motion *In Limine* requesting an adverse inference.").

### ii.   Whether Dr. Mesloh's Opinions Invade the Province the Jury

Plaintiffs also argue that Dr. Mesloh's opinions invade the province of the jury because he discounts and disregards the deposition testimony of Plaintiffs and other witnesses, including Jose Laboy, Johnny Bland, and the security guard, Rafael

---

[8] Because the Court finds that Dr. Mesloh may rely upon the Use of Force Report and deposition under Rule 703, it need not reach the issue of whether these constitute inadmissible hearsay evidence.

Case No. 15-cv-60535-BLOOM/Valle

Rodriguez. *See* Mesloh Dep. 29-32.[9] Defendants counter that Dr. Mesloh never said he "100% discounted" the testimony of Plaintiffs or their friends and that an expert is permitted to give credit where he deems appropriate based upon his education, training, and experience. *See Feliciano v. City of Miami Beach*, 844 F. Supp. 2d 1258, 1265 (S.D. Fla. 2012) (quoting *Walker v. Gordon,* 46 F. App'x. 691, 695–96 (3d Cir. 2002) ("'An expert is . . . permitted to base his opinion on a particular version of the disputed facts and the weight to be accorded to that opinion is for the jury.'"). Defendants, however, state that they would "otherwise agree and stipulate that no expert can specifically comment on the truthfulness or credibility of another witness." Def. Resp., ECF No. [124] at 7.

The Court agrees that Dr. Mesloh is permitted to base his opinion upon Defendants' version of the disputed facts over Plaintiffs' version. *See Feliciano*, 844 F. Supp. 2d at 1265 ("If the jury believes the plaintiff, then [plaintiff's expert's] opinion regarding the use of excessive force will likely be apportioned more weight. If, on the other hand, the jury credits the defendants' testimony as to what transpired on the date in question, the jury will likely discount [the expert's] opinion. In either case, it is well within the province of the jury to weigh the credibility of these competing versions [of the events].". However, Dr. Mesloh's testimony with regard to the credibility of the

---

[9] "Q: Are you – by talking about the number of inconsistencies that make this unlikely, are you judging his credibility or are you talking more about – as we just talked about the degree of damage and the photographs – that you have seen in your database? A. Well, a little of both. . . . Q: And you, as I understand, as far – with respect to him not being under the train when the bite occurred, where do you get that information from? A. Well, the depositions of the two individuals that were with him, Laboy and Bland. Well, they said initially he did – he refused to come out. Now, they did change – you know, later that's where the stories start to change between that of law enforcement and the Plaintiffs, but I'm not 100 – you know, it doesn't sound like he came out. Q. So you're judging his credibility there? A. I'm not sure if it's credibility. I just think there's a discrepancy in – in the statements at this point and that's what I'm pointing out is [its] inconsistencies." Mesloh Dep. 29-31.

other witnesses, Jose Laboy and Johnny Bland, including that their "stories start to change," is not permitted and will be stricken. *See United States v. Beasley*, 72 F.3d 1518, 1528 (11th Cir. 1996) ("Expert . . . testimony concerning the truthfulness or credibility of a witness is generally inadmissible because it invades the jury's province to make credibility determinations.").

### iii.   Whether Dr. Mesloh's Opinions Satisfy *Daubert*

Plaintiffs further seek to limit under the *Daubert* standard two opinions rendered by Dr. Mesloh: (1) "It is not reasonable to believe that the presence of Deputies Wengert and Smith would have affected the deployment of K9 Dino as he was trained only to respond to Deputy Acevedo's commands." Mesloh Report 7; and (2) "The physical evidence of the bites were consistent with people that were hiding or resisting and they're not consistent with somebody that was laid out in the open, stationary, an easy target." Mesloh Dep. 54. Plaintiffs argue that these opinions are not based on sufficient facts or data and are the product of unreliable principles or methods applied unreliably.

### a.   Opinion that Acevedo is Solely Responsible for K-9

With regard to Dr. Mesloh's first opinion about the effect of other deputies on the K-9, Plaintiffs argue that Dr. Mesloh has never worked for BSO, has never gone on any "ride-alongs" at BSO, and has never even had a conversation with anyone who may have worked as a BSO K-9 officer. Further, Dr. Mesloh "completely disagrees with, and disregards" Defendant Smith's "unequivocal testimony" that Defendant Wengert, as a senior handler, shared in some of the responsibility with Acevedo for the proper handling of the K-9. Mot. at 12 (citing Mesloh Dep. 14-19). Plaintiffs therefore maintain that Dr.

Mesloh's opinion is a "conclusory statement that is utterly contrary to the factual support offered by one of his own clients, Smith." *Id.*

In his deposition testimony, Dr. Mesloh specifically states the basis of his opinion that the K-9 would have been trained only to respond to Acevedo—namely, his personal experience as having been trained as a dog handler, as well as the standards set forth in three major K-9 associations:

> "A. . . . Well, legally he [Acevedo] is solely responsible. He's the one – the handler. He's the one that pulls the trigger that releases this dog, so there is nobody else that's responsible for the outcome. Q. Okay. And legally speaking, is that on a standard? A statute? What are you referring to when you say legally speaking? A. Well, that's a standard for the industry which is taught practically from day one of handler school that you go to; that's brought up in every legal training that they go to; that the handler is responsible, and if they receive an illegal order from a supervisor they are obliged not to follow it. Which I did once. . . . Q. . . . And when you say, 'standard,' is that something I could find in writing or trainings or anywhere? A. Probably on the web sites of three major K9 associations: the United States Police K9, National Police K9, International Association for Police Working Dogs. Q. And is that what you rely on for that particular statement? A. No, that's just what I learned form day one as a handler and is – was reinforced over years."

Mesloh Dep. 13:22-14:24.

In his Report, Dr. Mesloh also specifically quotes the BSO K9 Standard Operating Procedure, which states "all canine handlers will maintain control over their dogs at all times." Mesloh Report 6-7. The Court agrees with Defendants that Plaintiffs have provided no basis for its insistence that Dr. Mesloh must have worked for BSO or gone on "ride-alongs" in order to render his opinion that police dogs are trained to respond only to commends given by their handler. Indeed, "experts may testify to opinions, including those that are not based on firsthand knowledge or observation."

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 148, 119 S. Ct. 1167, 1174, 143 L. Ed. 2d 238 (1999).

Further, the Court does not find Dr. Mesloh's purported disagreement with Defendant Smith's deposition testimony stating that Wengert shared some of the responsibility with Acevedo in the proper handling of the K-9 to be a basis upon which to exclude Dr. Mesloh's opinion. Dr. Mesloh testified that if any of the officers had seen an illegal act, they were responsible for stopping it but, however, that "does not mean that every internal violation that the dog handler might make along the way or a search or seizure is going to transfer to a senior handler simply because he was there." Mesloh Dep. 17:10-17. Dr. Mesloh further states that the senior handler is there for advice, but they do not "take on the mantle of responsibility, nor are they in a supervisory role as they are in the field training environment." *Id.* 17:17-20. Based upon Dr. Mesloh's "reading of [BSO's] policy," he opines that "Acevedo made a choice to use his dog" and that although "Wengert may have been the senior handler, he could not make him stand down." *Id.* 19:1-4. Dr. Mesloh, however, did testify that there is "a possibility" that if a senior handler gives a command to a new handler, that new handler would listen to the senior handler, whether that command is lawful or not. Mesloh Dep. 20:6-25.

Plaintiffs do not question Dr. Mesloh's qualifications or experience as a K-9 expert. Dr. Mesloh has explained that his opinions that the presence of other deputies would not have reasonably affected the deployment of the K-9, which is trained only to respond to Acevedo's commands as its handler, are based upon his personal experience and training as a K-9 handler, certain law enforcement standards, and his reading of BSO's own policies regarding K-9 use of force. To the extent that Plaintiffs disagree with

Dr. Mesloh's conclusions, "'[o]n cross-examination, the opposing counsel is given the opportunity to ferret out the opinion's weaknesses to ensure the jury properly evaluates the testimony's weight and credibility.'" *Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

### b.  Opinion Regarding Physical Evidence of Bites

Plaintiffs argue that Dr. Mesloh's opinion that the physical evidence of the dog bites are consistent with people who were hiding or resisting, and not consistent with someone who was laid out in the open and stationary, are conclusory and without factual or analytical support. Specifically, Plaintiffs insist that Dr. Mesloh has never seen first-hand or even photographic evidence of what injuries that are consistent with someone who was laid out in the open might look like.[10]

At his deposition, Dr. Mesloh testified as follows:

Q. And in reaching that conclusion, you base that off of Deputy Acevedo's criminal deposition and Deputy Acevedo's use of force report, correct?

A. Not entirely. Those – those certainly were components of it, but others were based on, you know, the physical evidence of the bites were consistent with people that were hiding or resisting and they're not consistent with somebody that was laid out in the open, stationary, an easy target.

Q. How is that?

A. Well, I – I explained some of this earlier. The – the shoulder bite is just not going to happen out in the open. The dog would work its – I mean, if the dog – the person was laying on the ground, out in the open, the dog would target an arm or a leg. Even if the shoulder was closer, they're not – they know that the shoulder is not a great place to – to target. They have not been trained to target that area. The only way they're going to go for – hit a shoulder area if that's the only thing available to them at the time.

---

[10] Plaintiffs' Motion does not appear to take issue with Dr. Mesloh's opinions with regard to the duration of the bites or the re-engagement bites based upon physical evidence.

Q. And that's based – is that based on any particular studies?

A: Well, that's based, you know, the experience I – I have in viewing use of force cases in a wide range of disciplines. It just doesn't happen that way. As a dog handler, I've never seen it happen any other way. Although I have to say I've never seen anybody laid out on the ground and a handler put his dog on somebody, so I have to make that admission, so I guess I don't really know –

Q. Okay. Thank you.

A. – What that would look like.

Q. Thank you. So you haven't seen a circumstance where a person was laid out, not resisting, prone, and the dog was deployed on the person? . . .

A. That – that's correct. That would have been illegal and I would have had to have been – gotten involved, but, yes.

Q. So you don't really have anything to compare that scenario to?

A. Well, what I can compare it . . . to is when we've done work with people in bite suits that are prone, down on the ground, and that we have sent the dog.

Q. Bite suites don't – they prevent injuries, correct?

A. Yeah, it – it's a protective suit that . . . . So we have practice – you do practice on people that are proned out, but they don't – I've never seen one in real life. I have seen it in training, you know, 50 times, but that was just part of training. I would assume Broward does something very similar.

Mesloh Dep. 54-56.

Dr. Mesloh testified that he based his opinions regarding the physical bite evidence upon his experience in viewing use of force cases in a wide range of disciplines as well as his experience as a dog handler. When an expert offers experience-based testimony, the Court must ensure the witness has appropriately explained how his experience leads to the conclusion he reached, why that experience provides a sufficient

basis for the opinion, and how that experience is reliably applied to the facts. *United States v. Brown*, 415 F.3d 1257, 1261 (11th Cir. 2005).

Although Dr. Mesloh concedes that he has not personally seen an instance of a K-9 apprehending a suspect who is "laid out in the open"—indeed, noting that this scenario would be illegal—Dr. Mesloh testifies, based on his experience and training, that K-9s are typically trained to target certain parts of the body and would only target certain areas, such as a shoulder, if it is the only part of the body available at the time. Dr. Mesloh also testifies that he has indeed seen this scenario—around 50 times—under training circumstances. Although a bite suit prevents physical injuries, Dr. Mesloh could certainly, at minimum, testify that his opinions regarding the *location* of apprehension are consistent with this controlled training scenario. The Court therefore finds that Dr. Mesloh's testimony provides more than his "unexplained assurance that [his] opinions rest on accepted principles," and therefore Dr. Mesloh's opinions regarding the physical bite evidence are permitted. *Furmanite Am., Inc. v. T.D. Williamson, Inc.*, 506 F. Supp. 2d 1126, 1130 (M.D. Fla. 2007) (citing *McClain v. Metabolife Int'l, Inc.*, 401 F.3d 1233, 1242 (11th Cir. 2005)). Again, Plaintiffs will be provided the opportunity to highlight any weaknesses in Dr. Mesloh's opinion through vigorous cross-examination. *See Vision I Homeowners Ass'n, Inc. v. Aspen Specialty Ins. Co.*, 674 F. Supp. 2d 1321, 1325 (S.D. Fla. 2009) (quoting *Jones v. Otis Elevator Co.*, 861 F.2d 655, 662 (11th Cir. 1988)).

## IV. CONCLUSION

For the reasons stated above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendants' Motion to Strike, **ECF No. [118]**, is **GRANTED IN PART** and **DENIED IN PART**.

2.  Dr. Kirkham's opinions and testimony with regard to the nature and extent of Plaintiffs' injuries and the use of force in the scenario that Plaintiffs were completely under the train car upon K-9 apprehension are **STRICKEN**.

3.  Dr. Kirkham's opinions and testimony shall be limited to the use of force in the scenarios in which Plaintiffs were completely out or partially out from under the train car and to BSO's policies and practices.

4.  Plaintiffs' Motion to Strike, **ECF No. [120]**, is **GRANTED IN PART** and **DENIED IN PART**.

5.  Dr. Mesloh's opinions with regard to the credibility of Jose Laboy and Johnny Bland, including that their "stories start to change," ECF No. [120-2] at 29-31, is **STRICKEN**. Dr. Mesloh is not permitted to testify as to the credibility or truthfulness of other witnesses.

**DONE AND ORDERED** in Miami, Florida, this 11th day of July, 2016.

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

Copies to:  Counsel of Record