UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 15-cv-60535-BLOOM/Valle

HUMBERTO PELLEGRINO and
PEDRO CLAVERIA,

      Plaintiffs,

v.

GERALD WENGERT, et al.,

      Defendants.

_____/

ORDER ON MOTION FOR SUMMARY JUDGMENT

**THIS CAUSE** is before the Court upon Defendant Leonard Smith's ("Smith") Motion for Summary Judgment, ECF No. [117] (the "Motion"). The Court has carefully reviewed the Motion, all supporting and opposing submissions, the record in this case and applicable law. For the reasons set forth below, the Motion is granted in part and denied in part.

I. BACKGROUND

This action, filed by Plaintiffs Humberto Pellegrino ("Pellegrino") and Pedro Claveria ("Claveria") (collectively, "Plaintiffs") against Gerald Wengert ("Wengert"), Davis Acevedo ("Acevedo"), Leonard Smith ("Smith"), and Scott J. Israel, in his official capacity as Broward County Sheriff ("BSO") (collectively, "Defendants"), centers on allegations by Plaintiffs that BSO deputies used excessive force against them in investigating a potential burglary by allegedly releasing and instructing a police dog ("K-9") to attack Plaintiffs. Familiarity with the

procedural and factual background in this matter is assumed. *See Pellegrino v. Wengert*, No. 15-CIV-60535, 2015 WL 4065376, at *1 (S.D. Fla. July 2, 2015).[1]

Plaintiffs allege that on the evening of January 16, 2014, they and two other friends, Jose Laboy ("Laboy") and Johnny Bland ("Bland"), entered a property to paint freight trains and gondolas on the property. *See* Second Amended Complaint, ECF No. [75] ("SAC") ¶¶ 9-13. Rafael Rodriguez ("Rodriguez"), a security guard on a neighboring property, called 9-1-1 to report suspicious activity after spotting the four men. *See* Rodriguez Dep., ECF No. [128-2], 10. Plaintiffs heard a helicopter hovering overhead with no spotlight, and later learned the BSO was executing what is deemed a "Code 4"—that the helicopter and all arriving units come to the scene dark, with no lights or sirens, as to make their presence unknown. SAC ¶¶ 22-27. Plaintiffs, Laboy, and Bland hid under the train cars. *Id.* ¶ 25. The deputies surrounded the train cars and shouted warnings to the four men. *Id.* ¶ 34.

The record evidence presents varying accounts of what happened following these warnings. Bland testified that Claveria was the first to come out from under the train cars, "roll[ing] out on his knees and . . . laying belly down on the . . . gravel," with his arms stretched out in front of him and completely out from under the train car. Bland Dep., ECF No. [128-4] 72-73. Bland recalls hearing Claveria scream "I surrender. I give up. I'm not armed." "[b]efore the dog grabbed him." *Id.* 73-74.[2] According to Bland, he and Laboy rolled out from under the

---

[1] Plaintiffs have failed to submit a statement of material facts in compliance with Local Rule 56.1(a). As a result of Plaintiffs' failure to controvert Smith's statement of facts, Smith requests the Court deem Smith's facts as admitted, as provided in Local Rule 56.1(b). Although the Court admonishes Plaintiffs for failing to submit a statement of material facts in the format required under the Local Rules, the Court declines to impose such a procedural penalty. Indeed, the Court recognizes that Plaintiffs, albeit in an incorrect and haphazard format, do set forth a statement of facts that controvert those presented by Smith. *See* Resp., ECF No. [128] at 2-12.

[2] Claveria testified that he was underneath the train in a fetal position on his knees and that he saw two deputies and a dog. Claveria Dep., ECF No. [117-2] 181-84. Claveria asserts that when ordered to do so, he "came out to the left and stuck [his] arms out," while "repeating, 'I give up. I'm sorry. I'm unarmed. I

train car after being commanded to do so, stood with their hands up, and were escorted past the train cars and around Pellegrino. *Id.* 84-89. Bland and Laboy were then stopped and handcuffed by the third deputy, who Plaintiffs identify as Smith. *Id.* 89; *see also* Resp. at 10. Bland states that a deputy, who Plaintiffs identify as Smith, started escorting him and Laboy out, walking them past Pellegrino laying on the ground, a deputy with a K-9 on a leash standing next to him. *Id.* 90. According to Bland, he remembers seeing one of the deputies kicking one of Pellegrino's back legs out and while he was looking at Pellegrino, the deputy behind them said "Turn your f***ing heads around" and as he did so, Bland heard Pellegrino "screaming at the top of his lungs" and screaming "I surrender. I give up." *Id.* 91-92. Bland also testified that Pellegrino was screaming before Bland heard that same deputy contact the helicopter pilot and tell the pilot to turn the helicopter lights on. Bland did not recall if he had been handcuffed at this time. *Id.* 92-93.

Laboy similarly testified that there were three deputies and a K-9 on the scene, and that Claveria came out from under the train car "right away" after he was told to do so, rolling out and kneeling bent over with his hands in front of him, saying "I don't have anything. I don't have anything. I surrender. I surrender." Laboy Dep., ECF No. [128-3] 155-57. According to Laboy, after Claveria came out from under the train, the dog attacked Claveria, grabbing him by the right arm near the elbow. *Id.* 157. Laboy testified that a black deputy holding a rifle ordered Laboy and Bland to "roll out" from under the train car and they did so, remaining flat on their stomachs. *Id.* 161-64. The same deputy, who Plaintiffs identify as Smith, *see* Mot. at 5-8, then instructed Laboy to tell Pellegrino, who was approximately four feet away, to also "roll out" and

---

give up. I'm sorry. I'm unarmed.'" *Id.* 197-98. According to Claveria, he was lying flat on his stomach, completely out from under the train, and with his hands stretched out above him when the K-9 engaged him, and he estimated that the dog was biting and grabbing him for three to four minutes. *Id.* 199-200, 204.

Pellegrino did. *Id.* 164-66. Laboy states that the other two deputies walked toward Laboy and Bland, instructing the two—but not Pellegrino—to stand, and the third deputy remained watching Laboy and Bland, holding his rifle. *Id.* 170-72.  Laboy then heard one of the two deputies say to the other "I think he's ready for another feeding," and saw the deputy grab Pellegrino's leg and tug it in the air for the dog to latch onto. *Id.* 172-75. Laboy testified that the third deputy then told Laboy and Bland, who were standing with Pellegrino in front of them, "Don't f***ing look over there," pointing his rifle toward them. *Id.* 175-76. The deputy then stated, "As a matter of fact, come this way," and the deputy walked Laboy and Bland past Pellegrino being engaged by the K-9 to where Claveria was sitting alone and handcuffed, finally sitting Laboy and Bland down and handcuffing them to each other. *Id.* 176-77. Laboy testified that he could still hear Pellegrino's "excruciating screams" while Laboy and Bland sat for approximately six to eight minutes. *Id.* 178-79.

Pellegrino presented a similar account of the events, but testifying that Claveria was "halfway out" from under the train car when the dog bit him in the arm." Pellegrino Dep., ECF No. [117-3] 145. Pellegrino states that he heard Claveria screaming "Mercy, mercy, please, I surrender." and "We're not armed." and then "kept hearing the dog growling and then [seeing] [Claveria] get dragged right in front of [Pellegrino,] right past [him,] and [Claveria] was screaming that his arm was broken." *Id.* 147. Pellegrino's account, similar to that of Laboy and Bland, was that Laboy and Bland, following instructions from a deputy, rolled out from under the train car and called out to Pellegrino to do the same after being instructed by that deputy, who Plaintiffs identify as Smith. *Id.* 161-62. Pellegrino rolled out from under the train car, and then was ordered by the same deputy to roll two more times to get further away from the train car. *Id.* 163 ("A. The deputy asked me to roll two more times to get further away from the car. Q.

And which deputy is this that's asking that? A. I believe it was the black deputy."). According to Pellegrino, this same deputy ordered Laboy and Bland to stand up, and then Pellegrino heard two deputies walking up behind him and heard one of them say "I think he's ready to eat again." *Id.* 164. Pellegrino recounts that the black deputy then instructed Laboy and Bland to walk with him away from Pellegrino, after which he felt his legs get kicked apart and felt one of his legs get tugged and felt a dog bite him on the right leg. *Id.* 164-65. While being bitten, Pellegrino recalls hearing one of the deputies say "Oh, it's just the jeans. He's not even biting him so bad." and then feeling another dog bite. *Id.* 167.

Smith, however, provides a much different account of the events that occurred on the property that evening. *See* Smith Statement of Material Facts, ECF No. [117] ("Smith SOF"); Smith Dep., ECF No. [117-1]. According to Smith, when the K-9 engaged each Plaintiff, he was facing west, with his back to Wengert and Acevedo and was not looking in the direction of Plaintiffs or Laboy and Bland while they were under the train. Smith SOF ¶ 3; Smith Dep. 9-10. Smith testified that while the first suspect, Claveria, was being apprehended, he heard screaming, but continued to face in the opposite direction, with his back to the train to watch for potential other suspects, which was protocol. Smith Dep. 12-13. According to Smith, while still approximately fifteen feet away, Wengert and Acevedo eventually called to Smith and he turned around, seeing that Claveria had been apprehended by the K-9 and needed to be put in custody. *Id.* 15-17. Smith handcuffed Claveria and Wengert and Acevedo went to the other side of the train. Eventually the other two, Laboy and Bland, came out and one of the deputies, likely Wengert, brought Laboy and Bland to Smith. *Id.* 18-19, 22-23. Smith testified that he handcuffed the two suspects. *Id.* 24. Wengert then returned to the other side of the train, and Smith recalls hearing screaming. *Id.* 25. According to Smith, he stayed with the first suspect, Claveria, while

the other two, Laboy and Bland, were escorted out by other deputies Smith had requested to assist taking suspects out. *Id.* 26-27. Smith maintains that he only heard screaming from Claveria and Pellegrino and Acevedo praising the dog, but no alleged taunting. *Id.* 28.

Plaintiffs allege four counts against Defendant Smith, including Pellegrino's excessive use of force claim pursuant to § 1983 (Count V); Claveria's excessive use of force claim pursuant to § 1983 (Count VI); Pellegrino's common law excessive force claim (Count XI); and Claveria's common law excessive force claim (Count XII). Smith moves for summary judgment on all four counts.

## II. LEGAL STANDARD

A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including *inter alia*, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." *Miccosukee Tribe of Indians of Fla. v. United States*, 516 F.3d 1235, 1243 (11th Cir. 2008) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986)). A fact is material if it "might affect the outcome of the suit under the governing law." *Id.* (quoting *Anderson*, 477 U.S. at 247-48). The Court views the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006); *Howard v. Steris Corp.*, 550 F. App'x 748, 750 (11th Cir. 2013) ("The court must view all evidence most favorably toward the nonmoving party, and all justifiable inferences are to be drawn in the nonmoving party's favor."). However, material facts set forth in the movant's

statement of facts and supported by record evidence are deemed admitted if not controverted by the opposing party. S.D. Fla. L. R. 56.1(b).

"[T]he court may not weigh conflicting evidence to resolve disputed factual issues; if a genuine dispute is found, summary judgment must be denied." *Carlin Commc'n, Inc. v. Southern Bell Tel. & Tel. Co.*, 802 F.2d 1352, 1356 (11th Cir. 1986); *see also Aurich v. Sanchez*, 2011 WL 5838233, at *1 (S.D. Fla. Nov. 21, 2011) ("If a reasonable fact finder could draw more than one inference from the facts, and that inference creates an issue of material fact, then the court must not grant summary judgment." (citing *Hairston v. Gainesville Sun Publishing Co.*, 9 F.3d 913 (11th Cir. 1993)). The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. *Shiver v. Chertoff*, 549 F.3d 1342, 1343 (11th Cir. 2008). Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" *Ray v. Equifax Info. Servs., L.L.C.*, 327 F. App'x 819, 825 (11th Cir. 2009) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)). Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor. *Shiver*, 549 F.3d at 1343. "A mere 'scintilla' of evidence supporting the opposing party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty., Ala.*, 446 F.3d 1160, 1162 (11th Cir. 2006). Even where an opposing party neglects to submit any alleged material facts in controversy, the court must still be satisfied that all the evidence in the record supports the uncontroverted material facts that the movant has proposed before granting summary judgment. *Reese v. Herbert*, 527

F.3d 1253, 1268-69, 1272 (11th Cir. 2008); *United States v. One Piece of Real Prop. Located at 5800 S.W. 74th Ave., Miami, Fla.*, 363 F.3d 1099, 1103 n.6 (11th Cir. 2004).

### III. DISCUSSION

Smith sets forth four arguments in support of his Motion for Summary Judgment: (1) there is no genuine issue of material fact that Smith did not use excessive force or is liable for a failure to intervene during the use of alleged excessive force; (2) Smith is entitled to federal qualified immunity as to Counts V and VI; (3) Smith is entitled to state statutory immunity pursuant to Fla. Stat. § 768.28(9)(a) as to Counts XI and XII; and (4) Smith is entitled to a statutory defense pursuant to Fla Stat. § 776.085(1) because Plaintiffs' alleged injuries occurred during the commission or attempted commission of a forcible felony.

### A.  Federal Qualified Immunity—Counts V and VI

Smith asserts that he is entitled to qualified immunity for his actions and involvement in this case because his actions did not violate clearly established constitutional rights of either Plaintiff. "Qualified immunity offers complete protection for government officials sued in their individual capacities if their conduct 'does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Kingsland v. City of Miami*, 382 F. 3d 1220, 1231 (11th Cir. 2004) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1346 (11th Cir. 2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "This formulation of the qualified immunity inquiry is intended to protect government officials 'from undue interference with their duties and from potentially disabling threats of liability.'" *Jordan v. Doe*, 38 F.3d 1559, 1565 (11th Cir. 1994) (quoting *Harlow*, 457 U.S. at 806); *see also Jackson v. Humphrey*, 776 F.3d 1232, 1241-42 (11th Cir. 2015) ("The purpose for qualified immunity is to permit officials to act without fear of harassing litigation as long as they can reasonably anticipate

8

before they act whether their conduct will expose them to liability."). "Qualified immunity is an immunity from suit rather than a mere defense from liability." *McClish v. Nugent*, 483 F.3d 1231, 1237 (11th Cir. 2007).

"To receive qualified immunity, 'the public official must first prove that he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Kingsland*, 382 F.3d at 1232 (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)); *see also O'Rourke v. Hayes*, 378 F.3d 1201, 1205 (11th Cir. 2004) ("To be even potentially eligible for qualified immunity, the official has the burden of establishing that he was acting within the scope of his discretionary authority.") (citation omitted). Once a defendant raises the issue of qualified immunity and demonstrates that the acts complained of were committed within the scope of his discretionary authority, "the burden then shift[s] to the [plaintiff] to show that qualified immunity should not apply because: (1) the officers violated a constitutional right; and (2) that right was clearly established at the time of the incident." *Garczynski v. Bradshaw*, 573 F.3d 1158, 1166 (11th Cir. 2009).

"For an asserted right to be clearly established for purposes of qualified immunity, 'the law must have earlier been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law." *Jackson v. Sauls*, 206 F.3d 1156, 1164-65 (11th Cir. 2000) (quoting *Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.3d 1146, 1149 (11th Cir. 1994)). "A right may be clearly established for qualified immunity purposes in one of three ways: (1) case law with indistinguishable facts clearly establishing the constitutional right; (2) a broad statement of principle within the Constitution, statute, or case law that clearly establishes a constitutional right; or (3) conduct so egregious that a constitutional right was clearly violated, even in the total

absence of case law." *Lewis v. City of West Palm Beach, Fla.*, 561 F.3d 1288, 1291-92 (11th Cir. 2009) (internal citations omitted). "Qualified immunity 'gives ample room for mistaken judgments' but does not protect 'the plainly incompetent or those who knowingly violate the law.'" *Kingsland*, 382 F.3d at 1231-32 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 341 (1986)).

> For a constitutional right to be clearly established in a given case, the right's contours must be so clear that every, objectively reasonable official must understand that what the defendant, in the context of the circumstances of the case, is doing clearly violates the right. . . . [I]n the light of preexisting law, the unlawfulness must be apparent: plain, clear, obvious. Unless the government official's act is so obviously wrong, in the light of preexisting law, that only a plainly incompetent official or one who was knowingly violating the law would have committed the act, the official is entitled to qualified immunity.

*Snider v. Jefferson State Cmty. Coll.*, 344 F.3d 1325, 1328 (11th Cir. 2003) (citing *Vinyard v. Wilson*, 311 F.3d 1340, 1353 (11th Cir. 2002); *Malley*, 475 U.S. at 340-41).

"Additionally, the standard for determining if an officer violated clearly established law is an objective one and does not include inquiry into the officer's subjective intent or beliefs." *Jackson*, 206 F.3d at 1165 (citing *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir.1990). "Thus, a police officer is entitled to qualified immunity if a reasonable police officer could have believed his or her actions were lawful in light of clearly established law and the information possessed by the officer at the time the conduct occurred." *Id.* (citing *Stewart v. Baldwin County Bd. of Educ.*, 908 F.2d 1499, 1503 (11th Cir. 1990)).

### i.   Discretionary Authority

Smith asserts that he was acting within the course and scope of his duties as a BSO deputy responding to a request for assistance with a burglary and was at all times acting within his discretionary capacity in this matter. Plaintiff does not dispute that Smith was acting in his discretionary authority, and does not specifically dispute Smith's assertion that he was

responding to the BSO's dispatch request for assistance with a burglary in progress when he encountered Plaintiffs. *See* Smith SOF ¶ 1; Resp., ECF No. [128] at 1 (specifically disputing only paragraphs 3-13 of Smith's SOF). Accordingly, the Court finds that Smith has established that he was acting within his discretionary capacity with regard to the events at issue.

### ii.   Failure to Intervene

Plaintiffs concede that Smith did not use excessive force against either Plaintiff, but that Smith is liable for the failure to intervene during the alleged use of excessive force. It is well-settled in this Circuit "that an officer can be liable for failing to intervene when another officer uses excessive force." *Priester v. City of Riviera Beach, Fla.*, 208 F.3d 919, 924 (11th Cir. 2000) (citing *Ensley v. Soper,* 142 F.3d 1402, 1407–08 (11th Cir. 1998) ("[I]f a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable[.]"); *Riley v. Newton,* 94 F.3d 632, 635 (11th Cir.1996); *Byrd v. Clark,* 783 F.2d 1002, 1007 (11th Cir. 1986) ("If a police officer, whether supervisory or not, fails or refuses to intervene when a constitutional violation such as an unprovoked beating takes place in his presence, the officer is directly liable under Section 1983."); *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1441–42 (11th Cir. 1985)). "This liability, however, only arises when the officer is in a position to intervene and fails to do so." *Id.* at 924-25 (citing *Ensley,* 142 F.3d at 1407 ("[F]or an officer to be liable for failing to stop police brutality, the officer must be in a position to intervene[.]")). If the force used against Plaintiffs was excessive and if Smith did indeed observe and have the opportunity to intervene with the alleged excessive force, the law is clearly established that Smith would have a duty to do so.

Smith argues that Plaintiffs have presented no record evidence that Smith was looking in the direction of the apprehensions or that Smith could have or did observe excessive force, nor have they presented any case which demonstrates Smith should have known he needed to leave his position when hearing the yells of Plaintiffs. Smith further argues there is no clearly established U.S. Constitutional right that would require him to leave the suspects he was leading away and turn around when hearing other suspects being apprehended by a K-9. The record evidence, however, presents two different accounts of the events that occurred that night—one in which Defendant Smith was merely guarding the perimeter of the yard, his attention so focused on apprehending the suspects and looking out for further threats that he was unable to see or hear the events that unfolded, let alone step in and intervene; the other in which Defendant Smith was within earshot and sight of an allegedly unlawful K-9 apprehension, even instructing other potential witnesses, at gunpoint, to look away and indeed walking directly past Pellegrino being attacked by the K-9. On summary judgment, the Court is required to rely upon the latter version of the facts. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006) ("At the summary judgment stage, courts view the totality of the circumstances in the light most favorable to the nonmoving party. . . . That is, courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, we credit the nonmoving party's *version*.") (emphasis in original) (internal quotation and citation omitted); *Priester*, 208 F.3d at 925 ("In reaching the conclusion that [an officer] was entitled to judgment as a matter of law, it appears that the district court mistakenly relied upon *Defendants'* version of the facts, rather than Plaintiff's version of the facts, as it was required to do.") (emphasis in original).

Both Plaintiffs and Smith rely upon *Ensley v. Soper*, 142 F.3d 1402 (11th Cir. 1998), in which the Eleventh Circuit held that a defendant officer was entitled to qualified immunity on the officer's alleged failure to intervene with alleged excessive force. The Court emphasized that the plaintiffs in that case could not point to any case recognizing a duty to intervene on materially similar facts—specifically, that "an officer has a duty to abandon his attempt to arrest one armed attacker in order to protect another armed attacker against whom other officers may be using excessive force." *Id.* at 1407. The Court determined that the officer "had discretion whether [one armed attacker] or the officers arresting [the other attacker] deserved his immediate attention." *Id.* The Eleventh Circuit further note that "in order for an officer to be liable for failing to stop police brutality, the officer must be 'in a position to intervene.'" *Id.* The record evidence in *Ensley* demonstrated that once the second attacker "joined the fray," the officer became actively involved in the arrest of that attacker and the officer therefore claimed that he did not observe any alleged excessive force against the other individual, and that even the armed attacker conceded that he did not see any abuse. *Id.* at 1408. The plaintiffs presented no evidence showing that the officer could or did observe excessive force and the officer had "little choice but to remain" with the other armed attacker as they brought him under control and secured him in a police vehicle. *Id.* Based upon these facts, the Eleventh Circuit held that "no reasonable juror could find that [the officer] was 'in a position to intervene'" and there was "no evidence that might lead a reasonable juror to conclude that [the officer] violated any clearly established right . . . to intervention." *Id.*

Smith argues that, similar to *Ensley*, there is no record evidence that Smith was looking in the direction of the apprehensions and could have or did observe excessive force. Smith further asserts that not only was Smith controlling *two* suspects, he was also still tasked with and

responsible for protecting the rear perimeter, which was the direction he was facing. Based upon the evidence presented by Plaintiffs, however, the circumstances of the instant case are distinguishable from those in *Ensley*.

According to Claveria, Laboy, and Bland, Claveria was completely out from under the train car—and according to Pellegrino, halfway out from under the train car with his arms outstretched—and calling out that he was unarmed and surrendered. In *Edwards v. Shanley*, the Eleventh Circuit emphasized that "clearly established federal law prohibits the police from subjecting a compliant subject who is attempting to surrender to a lengthy dog attack." 666 F.3d 1289, 1298 (11th Cir. 2012). The *Edwards* Court similarly held that an officer who was present for an entire dog attack and, taking the plaintiff's account as true, "made no effort to intervene and stop the ongoing constitutional violation" was not entitled to qualified immunity. *Id.*

Plaintiffs assert that the facts in this action are easily distinguished from *Hadley v. Gutierrez*, a case cited by Smith, in which the Eleventh Circuit ruled that the district court erred in denying qualified immunity to an officer who failed to intervene in another officer's use of excessive force. 526 F.3d 1324, 1330-31 (11th Cir. 2008). The Court held that an officer was not in a position to intervene because the plaintiff had not presented "evidence from which a reasonable jury could find that [the officer] could have anticipated and then stopped [another officer] from punching [plaintiff] once in the stomach." *Id.* at 1331. Here, Plaintiffs argue, "rather than a single blow, . . . Deputies Wengert and Acevedo continuously and collectively commanded and allowed the K-9 to 'feed' on the Plaintiffs [while] Deputy Smith stood idly." Resp., ECF No. [128] at 17. The Court agrees that these circumstances are distinguishable.

In constrast, in *Priester*, the Eleventh Circuit held that an officer had a clearly established duty to intervene when another officer, investigating a purported burglary, sicced a dog upon the

plaintiff who was allegedly surrendered and lying down. 208 F.3d at 927-28. The plaintiff in that case testified that the dog attacked him for "more than an eternity" and, although one of the officers testified that the incident may have lasted for only five or ten seconds, another officer admitted it may have lasted as long as two minutes. *Id.* at 925. The Court held that "[t]wo minutes was long enough for a reasonable jury to conclude that [the officer] has time to intervene and to order [the other officer] to restrain the dog." *Id.* The Court further found that "because [the officer] stood on top of the canal with his flashlight on the scene and watched the entire event and was in voice contact with [the other officer], this case is distinguishable from other cases where in officer who failed to intervene was found not liable because he did not observe the violation or have the opportunity to intervene." *Id.* (citing *Ensley*, 142 F.3d at 1407-08; *Riley v. Newton*, 94 F.3d 632, 635 (11th Cir. 1996) (holding an officer had no reasonable opportunity to intervene when he was engaging in the arrest of another suspect, was on opposite sides of a truck, and had observed no excessive force until after the other officer shot the suspect)). The Court held that no "particularized case law [was] necessary to overcome [the officer's] claim of qualified immunity" because a police officer's "duty to intervene when he witnessed the use of excessive force and had the ability to intervene was clearly established" at the time of the incident and that "no reasonable officer would believe that either the amount of force used in these circumstances or the failure to intervene was objectively reasonable." *Id.* at 927.

Under all versions of the facts, Pellegrino, Laboy, and Bland were still under the train cars when Claveria was engaged by the K-9, so Smith's argument that he was maintaining control over two suspects is not relevant with regard to a purported failure to intervene in any alleged excessive force exerted against Claveria. However, Defendant Smith argues that, because he was standing fifteen feet away, with his back turned and guarding the perimeter, he did not

and could not have observed the K-9 apprehension of Claveria. Specifically, Smith notes that Claveria testified that, while lying in the fetal position under the train car, he only observed two deputies and a dog—and made no mention of observing Smith.

The Court also agrees with Plaintiffs that these circumstances are distinguishable from those in *Gomez v. Lozano*, another case cited by Smith. In *Gomez*, the Court recognized the that an officer "who never hits a suspect yet never prevents another officer's use of excessive force violates § 1983." 839 F. Supp. 2d 1309, 1321-22 (S.D. Fla. 2012). The Court, however, determined that the officer, Chambers, was not liable for nonfeasance because he lacked the ability to intervene. Specifically, the Court held that Officer Chambers found himself at the scene of a brawl, a video recording showing that a large crowd had gathered at the scene, with audible "boos" emanating from the crowd. The Court emphasized that Officer Chambers had turned around to deal with the rowdy and hostile crowd, that the entire incident lasted around eleven seconds, and that Officer Chambers was not even aware of the alleged violence, and therefore "the only reasonable inference [was] that Officer Chambers could not intervene." *Id.* 1322 (finding inapposite *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009), in which officers "were not attempting to control a hostile crowd as other officers attacked the plaintiffs" and "[t]he record showed that [there] was no mob activity, and the video evidence showed that police officers were lackadaisical, moseying around as other officers beat and attacked the plaintiffs").

Similar to *Priester*, Claveria testified that the K-9 bite "felt like forever" and that he estimated the dog was on him, biting and grabbing him, for three or four minutes—sufficient time for Smith to observe and intervene. This stands starkly in contrast to the single blow delivered by the officer in *Hadley* or the gunshot in *Riley*, in which the observing officer had no

opportunity to anticipate and then stop the use of force. *See Hadley*, 526 F.3d at 1331; *Riley*, 94 F.3d at 635. Further, all four suspects testified as to some variation of Claveria repeatedly screaming that he was unarmed and surrendered. The record evidence demonstrates that Smith, although purportedly standing fifteen feet away with his back turned, was clearly within earshot of the K-9 engagement. He testified that he heard screaming and that, similar to *Priester*, Smith remained in voice contact with Wengert and Acevedo, turning around when they called him over following Claveria's apprehension. Smith testified that he was occupied with his back to the train car, watching for potential other suspects as was his protocol. However, this guarding of the perimeter did not create the same level of impediment to observing the alleged excessive force as the officer in *Ensley* faced in subduing an armed attacker or in controlling a hostile crowd in *Gomez. See* 142 F.3d at 1407; 839 F. Supp. 2d at 1321-22. Under Plaintiffs' version of the facts, Smith, who was in a position to observe excessive force against Claveria that continued for several minutes, had a clearly established duty to intervene.

Unlike the apprehension of Claveria, when Pellegrino was engaged by the K-9, both Smith's and Plaintiffs' version of the facts indicate that Smith was maintaining control over two suspects, Laboy and Bland. However, under Plaintiffs' version of the facts, Laboy and Bland, although not yet handcuffed,[3] had already surrendered and were continuing to fully comply with the deputies' orders. That the two suspects under Smith's control had already surrendered and were acting in full compliance with any instructions from deputies stands in stark contrast to the circumstances of an active, armed attacker faced by the officer in *Ensley*, 142 F.3d at 1407, or the hostile crowd in *Gomez.* 839 F. Supp. 2d at 1321-22.

---

[3] It is unclear whether or not Laboy and Bland were handcuffed during Pellegrino's apprehension. Smith appears to testify that he immediately handcuffed Laboy and Bland, but Laboy and Bland testified that they were not handcuffed until they reached the location where Claveria was sitting.

Further, in contrast to *Ensley*, Laboy and Bland both testified that they heard and observed the K-9 apprehension of Pellegrino, allowing a reasonable inference that Smith, who was standing with Laboy and Bland, could have also heard and observed Pellegrino purportedly surrendering as well as the other deputies' alleged comments and actions. *Cf. Ensley*, 142 F.3d at 1408 ("In fact, even [the armed attacker] concedes that he did not see any abuse . . . ; since [the officer who did not intervene] was with [the armed attacker], [the armed attacker's] testimony corroborates [the officer's] claim that he was not in a position to know [the other suspect's] circumstances."). Indeed, under Plaintiffs' version of the facts, immediately after Laboy and Bland heard one of the other deputies state that the dog was ready for another feeding and saw him kick apart Pellegrino's legs, Smith ordered Laboy and Bland to look away and continued to lead Laboy and Bland directly past Pellegrino being apprehended by the K-9. The Court also notes that, as discussed *supra*, Smith testified that he remained in voice contact with Wengert and Acevedo, turning around when the other deputies called for him. Moreover, Pellegrino testified that after he had come out from under the train car but before he was engaged by the K-9, a deputy, who Plaintiffs identify as Smith, instructed him to roll two more times to get even further away from the train car. If true, Smith certainly was aware that Pellegrino was out from under the train car when he heard Pellegrino's screams.[4] The K-9 apprehension of Pellegrino could have lasted several minutes—Bland testified that he and Laboy sat handcuffed for six to eight minutes, during which time they continued to hear Pellegrino's screams—which, under *Priester*, would have provided Smith the opportunity to intervene.

If a jury believes Plaintiffs version of the events, that jury could find that Smith, tacitly approved of the alleged excessive force and intentionally sought to eliminate others from

---

[4] Smith conceded in his deposition that a K-9 attack upon an individual who comes out from under the train car, puts hands up, lays on the ground, and poses no threat would be against protocol and would amount to excessive force. Smith Dep. 14-15.

witnessing the other deputies' actions, purposefully turning his back to the scene, rifle in hand, and commanding Laboy and Bland to look away. This was despite hearing the screams and surrendering of Claveria, the taunting of the other deputies, and Pellegrino's screams and pleading as he surrendered. Crediting Plaintiffs' recitation of the events, Smith could have observed and was in a position to intervene with the alleged use of excessive force despite being tasked with guarding the perimeter and maintaining control over two surrendered suspects, and Smith's duty to intervene, therefore, was clearly established on the night in question.[5]

## B. State Statutory Immunity – Counts XI and XII

### i. Sovereign Immunity under Fla. Stat. § 768.28(9)(a)

Defendant Smith avers that he is entitled to sovereign immunity as to the two common law claims (Counts XI and XII) against him pursuant to Fla. Stat. § 768.28(9)(a), which provides that "[n]o officer, employee, or agent of the state . . . shall be held personally liable in tort . . . unless such officer, employee, or agent acted in bad faith or with malicious purpose or in a manner exhibiting wanton and willful disregard for human rights, safety, or property." Smith maintains that because his job was to guard the perimeter and apprehend suspects away from the active scene, Smith's actions cannot be viewed as having been intentional, in bad faith, or malicious. Smith also argues that a cause of action for failure to intervene during the course of a battery does not exist in Florida because battery is an intentional tort, which cannot be premised upon an omission or failure to act.

---

[5] Smith also argues that Plaintiffs have provided no response to the testimony of Defendants' expert, Dr. Charles Mesloh, stating Smith followed procedure and protocol for his attention to remain focused on potential other suspects. *See* Mesloh Dep., ECF No. [129-2] 13-18. The opinion of this expert, while helpful to a trier of fact, is not enough to overcome the issue of fact created by conflicting witness testimony. Taking Plaintiffs allegations in the light most favorable to them, Plaintiffs have "create[d] a triable issue of fact as to whether one or both of the [deputies] used excessive force upon them and whether . . . [Smith] failed to intervene to stop the use of such force." *Velazquez v. City of Hialeah*, 480 F.3d 1232, 1233 (11th Cir.), *opinion superseded on reh'g*, 484 F.3d 1340 (11th Cir. 2007)

Indeed, "[i]f excessive force is used in an arrest, the ordinarily protected use of force by a police officer is transformed into a battery." *Essex Ins. Co. v. Big Top of Tampa, Inc.*, 53 So. 3d 1220, 1223 (Fla. 2d DCA 2011) (quoting *City of Miami v. Sanders,* 672 So.2d 46, 47 (Fla. 3d DCA 1996)). "The requisite elements for an intentional tort are more stringent than the elements for negligence actions." *Andrade v. Miami Dade Cty.*, No. 09-23220-CIV, 2010 WL 4069128, at *8 (S.D. Fla. Sept. 30, 2010) (citing *City of Miami v. Sanders*, 672 So. 2d 46, 47 (Fla. 3d DCA 1996)); *see also Essex*, 53 So. 3d at 1223 ("[I]t is not possible to have a cause of action for 'negligent' use of excessive force because there is no such thing as the 'negligent' commission of [an] 'intentional' tort, such as battery."). "The elements for 'battery are intent and contact[,]" and "[a] cause of action for battery requires the showing of intentional affirmative conduct and cannot be premised upon an omission or failure to act." *Id.* (citing *Sanders*, 672 So. 2d at 47; *Restatement (Second) of Torts § 18*; *Sullivan v. Atlantic Fed. Sav. & Loan Ass'n,* 454 So. 2d 52 (Fla. 4th DCA 1984)).

Here, Plaintiffs Pellegrino and Claveria allege identical common law claims against Defendant Smith for failure to intervene (*see* Counts XI and XII of the SAC). Specifically, Plaintiffs assert that Smith witnessed the allegedly unreasonable and unnecessarily excessive force that Wengert and Acevedo were inflecting upon each Plaintiff prior to his arrest and that Smith breached his duty to intervene and stop the alleged excessive force that occurred. Plaintiffs further allege that the "acts, events, or omissions of action" committed by Smith in the course of his employment were in bad faith or malicious purpose or in a manner exhibiting wanton and willful disregard of human rights, safety, or property.

Because Plaintiffs have alleged that Smith failed to intervene—an omission or failure to act—and "no affirmative acts [have] been pled," the omission or failure to act "cannot support

the intentional tort of battery necessary to the excessive force claim." *Andrade*, 2010 WL 4069128, at *8 (citing *Sanders,* 672 So. 2d at 47–48 (reversing a jury finding in favor of a plaintiff alleging excessive force based on negligent conduct by a police officer)). Summary judgment, accordingly, is appropriate with regard to Counts XI and XII for common law failure to intervene with the alleged use of excessive force.

### ii.   Statutory Defense under Fla. Stat. § 776.085(1)

Defendant Smith further asserts a statutory defense pursuant to Fla. Stat. § 776.085(1). The Court has already determined that Plaintiffs cannot maintain a claim for failure to intervene under common law because the intentional tort of battery cannot be premised upon an alleged omission or failure to act. The Court, therefore, does not reach the issue of whether a statutory defense is available to Defendant Smith pursuant to Fla. Stat. § 776.085(1).

## IV. CONCLUSION

For the reasons the foregoing reasons and as detailed above, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant Leonard Smith's Motion for Summary Judgment, ECF No. [117], is **GRANTED IN PART** and **DENIED IN PART**.

2. Summary judgment is **GRANTED** as to Counts XI and XII of the SAC. Counts XI and XII are **DISMISSED WITH PREJUDICE**.

3. Summary judgment is **DENIED** as to Counts V and VI of the SAC.

Case No. 15-cv-60535-BLOOM/Valle

**DONE AND ORDERED** in Miami, Florida, this 12th day of July, 2016.

_____

**BETH BLOOM**
**UNITED STATES DISTRICT JUDGE**

cc:      counsel of record

22